Catherine BOSLEY, et al., Plaintiffs,

v.

WILDWETT.COM, et al., Defendants.

No. 4:04–CV–393.

United States District Court, N.D. Ohio.

March 31, 2004.

Mark S. Colucci, Youngstown, OH, for Catherine Bosley, Richard Brown, Plaintiffs.

Coffinz, c/o Steve Arend, Peoria, AZ, Pro se, Lisa S. DelGrosso, Brouse McDowell, John C. Fairweather, Brouse McDowell, Akron, OH, John B. Juhasz, Jr., Ingram & Ingram, Theodore T. Macejko, Jr., Youngstown, OH, Alisa L. Wright, Roetzel & Andress, Akron, OH, Derek A. Newman, Newman & Newman, Seattle, WA, Ronald S. Kopp, Roetzel & Andress, Stephen W. Funk, Roetzel & Andress, Akron, OH, Slatner.com, Bryan Erik Slatner, Charlotte, NC, Pro se, Frederick M. Lombardi, Buckingham, Doolittle & Burroughs, Akron, OH, Jennifer Reh, Ruden McClosky, PA, Robert W. Boos, Ruden McClosky, PA, Tampa, FL, Philip R. Wiese, Buckingham, Doolittle & Burroughs, Akron, OH, for Wildwett.com, Blabbingmike News Blab, aka Newsblab.Com, Coffinz, aka Coffinz.Com, Cheef Dot Com, aka Cheef.com, Fleshbot.com, My Way, aka Myway.Com, Bugs Ltd., S.K. Entertainment, Internet Key Inc., Bomis Inc., eXostream Communications, Digitaleffex, Marvad Corporation, Perrenial Corp. N.V., aka Sexbrat.com, Navensink House Ltd., aka Pornking.com, Slatner.com, eZanga.com, Illcash, Dream Girls, Inc., Defendants.

## MEMORANDUM, OPINION, AND ORDER

GWIN, District Judge.

Pending before the Court is Plaintiffs' motion for a preliminary injunction. For the reasons described below, the Court grants the motion, and requires that Plaintiffs post a bond of one hundred dollars ($100).

## I. BACKGROUND

Plaintiff Catherine Balsley (known in the reporting business as "Catherine Bosley") previously worked as a television news reporter for WKBN, Channel 27, the CBS television affiliate in Youngstown, Ohio. She worked for WKBN as a news anchor for approximately ten years, leading to her status as regional celebrity.

In March of 2003, while she was on vacation, Plaintiff Bosley and her husband went to a Florida nightclub. On that night, the nightclub held a "wet t-shirt" contest. Plaintiff Bosley participated. While participating in the contest, Plaintiff Bosley removed her clothing. Plaintiffs assert that, without notice, or consent, Dream Girls Inc. ("Dream Girls") videotaped Plaintiff Bosley's performance for publication and reproduction in the form of videos and DVDs. Dream Girls is a video production company based out of Tampa, Florida. Jim Faile, President of Dream Girls, describes the productions of Dream Girls as being similar to *Girls Gone Wild.*

Since the incident, images of the Plaintiff have been displayed on the internet through a series of web sites, advertising pictures and videos of the "naked anchor woman." In May of 2003, Defendant Dream Girls, d/b/a DreamGirlsVideos.com, released a video of the wet t-shirt contest, entitled "Dream Girls' Spring Break 2003, volume one." Thereafter, Defendant Dream Girls, d/b/a WildWetT.com, released a second version of the video, emphasizing the appearance of Catherine Bosley or the "naked anchor woman" on the tape.

The Spring Break 2003 video displays wet t-shirt contests, with no commentary or script other than the emcee soliciting contestants to take their clothes off. The WildWetT video shows the wet t-shirt contest that Bosley participated in, a montage of pictures of Bosley in various states of undress, and additional film clips of women (not Bosley) masturbating and engaging in other sexual acts. Again, the tapes have no plot or commentary apart from pictures of naked women engaged in sexual acts or displays.

On February 5, 2004, Marvad Corporation ("Marvad"), d/b/a SexBrat.com, states that it obtained a license of the video of Plaintiff Bosley's performance from Defendant Dream Girls (collectively "Defendants"). SexBrat.com is a website involved in the distribution of adult entertainment material through a subscription service on the Internet. Defendant Marvad allowed members who paid the SexBrat.com membership fee ($ 37.12 per month) to see portions of Plaintiff Bosley's performance, as well as other images available on the "members only" portion of their website.

For a period of time, website searches related to Catherine Bosley outnumbered those related to Paris Hilton as the most popular search on the World Wide Web. Indeed, Defendant Marvad reports a significantly greater number of hits during the time it presented the images of Plaintiff Bosley. For example, on February 23, 2004, there were 9,457 hits on SexBrat.com. Yet, on February 24, 2004, the day after the images of Plaintiff Bosley were posted, there were 111,663 hits on SexBrat.com. The number of hits subsequently diminished.

Finally, Plaintiffs claim that Defendants, especially Defendants Marvad and Dream Girls, used depictions of her as an advertisement to promote the sexually-related materials marketed by Defendants. Plaintiff Bosley asserts that she did not give her consent for such an endorsement.

Due to the publicity generated by this incident, in December of 2003, Plaintiff Bosley resigned from her position as an anchor at WKBN. Plaintiff Bosley asserts that Defendants' unauthorized use of her image caused her employer to request that she resign. In addition, she says that Defendants' continued use of her image prevents other employment in the television news field, the only career she has had.

On March 8, 2004, this Court issued a temporary restraining order ("TRO"), prohibiting Defendants from selling the video of Plaintiff Bosley's performance or otherwise using depictions of Plaintiff Bosley on their websites. On March 19, 2004, the Court issued a revised TRO, clarifying that the TRO only prohibits Defendants from selling images of Plaintiff Bosley or otherwise using images of her to promote the sale of Defendants' sexually-related goods. Importantly, the Court did not enjoin Defendants from mentioning Plaintiff Bosley or engaging in a public discourse about the incident in question. For example, the Court clarified that Defendants could post on their websites links to newspaper articles about the Bosley incident.

On March 24, 2002, the Sixth Circuit issued a stay with regard to the TRO. This Court proceeded to consider Plaintiffs' motion for a preliminary injunction. On March 29, 2004, the Court concluded its hearing with respect to the preliminary injunction. The Court now rules on the merits of that motion.

## II. LEGAL STANDARD AND ANALYSIS

The Court applies the traditional four-part test for determining whether a preliminary injunction under Fed.R.Civ.P. 65(a) is appropriate: (1) whether there is a substantial likelihood of success on the merits, (2) whether the injunction is necessary to prevent irreparable injury, (3) whether the injury to the plaintiff outweighs any harm to the nonmovant, and (4) whether the injunction would serve the public interest. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir.1985). The Court will analyze each factor in turn.

## A. Likelihood of Success on the Merits

Plaintiff Bosley alleges that Defendants' sale of the video tape of her performance and Defendants' use of her images of her on their websites violated her statutory and common law rights.[1] To determine if Plaintiffs have established substantial likelihood of success on the merits, this Court delves into the applicable law. Since there is no significant difference between Ohio and Florida law as to the issues of concern at this stage of the litigation, the Court does not find it necessary to engage in a choice of law analysis at this time.[2]

### 1. Applicable Law

At common law, invasion of the right to privacy is a tort. This tort consists of four separate causes of action:

1. Intrusion upon the plaintiffs seclusion or solitude, or into this private affairs.

2. Public disclosure of private facts about the plaintiff.

3. Publicity which places the plaintiff in a false light in the public eye.

4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.

Restatement (Second) of Torts, § 652A (1977); *see also* W. Prosser, Law of Torts 804–14 (4th ed.1971); W. Prosser, *Privacy,* 48 CAL. L. REV. 383 (1960). Florida has adopted all four of these classifications.[3] Meanwhile, Ohio has adopted three of the above classifications, but not false light.[4]

■ In asserting that Defendants breached her "common law right to persona and image," Plaintiff Bosley alleges the fourth cause of action—appropriation of her name or likeness for the defendant's advantage. (Pls.' am. compl. at 8). Under common law, "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy, and *the use or benefit need not necessarily be commercial.*" *Zacchini v. Scripps–Howard Broadcasting Co.,* 47 Ohio St.2d 224, ¶ 1, 351 N.E.2d 454 of syllabus (Ohio 1976), *rev'd on other grounds,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (emphasis added). Thus, Ohio law prohibits the publication of another's name or likeness in a commercial use that draws from that

**1.** Plaintiff Bosley's spouse, Richard Brown, also joins in this action. Defendant Dream Girls argues that Plaintiffs have not established a loss of consortium claim. However, the matter is not directly before the Court at this stage of the proceedings. The Court reserves discussion of the matter for the dispositive motion stage.

**2.** It is notable that Ohio law only accepts written consent to authorize the use of one's persona, whereas Florida law accepts either written or oral consent. However, as described *infra,* this difference in the statutes would not affect the outcome of the Court's decision.

**3.** *Cason v. Baskin,* 155 Fla. 198, 20 So.2d 243 (1944)(Seminal case in Florida recognizing a cause of action based upon an invasion of

privacy); Robert C. Sanchez, *Business Law: Unauthorized Appropriation of an Individual's Name or Likeness—Florida's Appellate Courts and 540.08,* 72 FLA. BAR. J. 57, 57 (1998) (observing that "Florida courts accepted the four general categories noted by Prosser").

**4.** *See Housh v. Peth,* 165 Ohio St. 35, at syllabus ¶ 2, 133 N.E.2d 340 (Ohio 1956) (Seminal Ohio case recognizing a cause of action based upon an invasion of privacy); *LeCrone v. Ohio Bell Telephone Co.,* 120 Ohio App. 129, 201 N.E.2d 533 (1963); *Shibley v. Time, Inc.,* 40 Ohio Misc. 51, 321 N.E.2d 791 (Ohio Com.Pl. 1974). However, Ohio has not adopted a cause of action for invasion of privacy based on false light. *See M.J. DiCorpo, Inc. v. Sweeney,* 69 Ohio St.3d 497, 507, 634 N.E.2d 203 (1994); *see also Yeager v. Local Union,* 6 Ohio St.3d 369, 372, 453 N.E.2d 666 (1983).

persons "reputation, prestige, or other value associated with him, for purposes of publicity." *Id.* at 231, 351 N.E.2d 454.

■ Nevertheless, several exceptions exist to this common law right. First, incidental use of one's name or likeness is permissible. See e.g., *Vinci v. American Can Company,* 69 Ohio App.3d 727, 591 N.E.2d 793 (Ohio 1990) (holding that informational blurbs about Charles Vinci, the 1956 and 1960 weight-lifting Olympic gold medalist, on Dixie Cups was merely incidental to the promotion of the Dixie Cups and, thus, permissible.) Second, one's name and appearance, in and of themselves, are not private and, therefore, may be brought before the public. *Id.* Third, and most importantly, a legitimate public interest exception exists. "One of the primary limitations upon the right of privacy is that this right does not prohibit the publication of matters of general or public interest, or the use of the name or picture of a person in connection with the publication of legitimate news." *Cason v. Baskin,* 155 Fla. 198, 216, 20 So.2d 243 (Fla.1944) (quoting 41 Am.Jur. 937–38). "However, the phrase 'public or general interest,' in this connection, does not mean mere curiosity." *Id.* at 216, 20 So.2d 243 (quoting 41 Am.Jur. 935).

■ In addition to this common law right to privacy, Plaintiff Bosley asserts her statutory right to publicity.[5] "The

right of publicity is an intellectual property right of recent origin which is the inherent right of every human being to control the commercial use of his or her identity. The right of publicity is a creature of state law and its violation gives right to a cause of action for the commercial tort of unfair competition." *ETW Corp. v. Jireh Publ'g, Inc.,* 332 F.3d 915, 928 (6th Cir.2003) (internal citations omitted).

Ohio and Florida statutes protect one's right of publicity, stating that an individual has the right to own, protect, and commercially exploit his or her own name, likeness, or persona. This right has its roots in the fourth type of invasion of privacy described above—appropriation of one's name or likeness. *Id.* In establishing a statutory right to publicity, Ohio Revised Code § 2741.02 provides, in pertinent part:

(A) Except as otherwise provided in this section, a person shall not use any aspect of an individual's persona for a commercial purpose during the individual's lifetime or for a period of sixty years after the date of the individual's death.

(B) A person may use an individual's persona for a commercial purpose during the individual's lifetime if the person first obtains the written consent to use the individual's persona from a person specified in section 2741.05 of the Revised Code.

Nevertheless, statutes regarding the right to publicity do not trump the common law right to privacy. Sanchez, *supra* note 1, at 57. ("Although § 540.08 now codifies the fourth theory [of the right to privacy] described above, the [Florida] statute permits a party to proceed under available common law theories as well.") *But see id.* at 61 ("Florida courts have been reluctant to allow plaintiffs any relief under the common law than they would not otherwise be entitled to under the statute.").

---

**5.** The statutory right to publicity differs from the common law right to privacy. It is notable that, under common law, a defendant need not appropriate a plaintiff's image for economic gain to violate one's right to privacy. RESTATEMENT (SECOND) OF TORTS, § 652C, cmt. b. "Statutes in some states have, however, limited the liability to commercial uses of the name or likeness." *Id.* Ohio and Florida are such states. Furthermore, the privacy right is a personal interest which cannot be transferred while the right to publicity is a property interest which is assignable.

OHIO REV. CODE § 2741.02.[6] Meanwhile, Florida Statute § 540.08 provides, in pertinent part:

(1) No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent . . .

FLA. STAT. § 540.08. It is notable that Plaintiff Bosley's rights under either the Ohio or the Florida statute deal with challenging "commercial" uses of her image.

Similar to common law, both statutes contain a public interest exception. Ohio law provides:

(D) For purposes of this section:

(1) A use of an aspect of an individual's persona in connection with any news, public affairs, sports broadcast, or account does not constitute a use for which consent is required . . .

OHIO REV. CODE § 2741.02(D)(1). Florida law similarly states:

(3) The provisions of this section shall not apply to:

(a) The publication, printing, display, or use of the name or likeness of any person in any newspaper, magazine, book, news broadcast or telecast, or other news medium or publication as part of any bona fide news report or presentation having a current and legitimate public interest and where

such name or likeness is not used for advertising purposes;

FLA. STAT. § 540.08.

Applying statutory and common law, at first blush, Plaintiff Bosley's assertions create a substantial likelihood of success on the merits. Plaintiff Bosley avers that she gave no written or oral permission for the use of her likeness. The Defendants come forward with no strong evidence that she did. Plaintiff Bosley alleges that Defendants sold, and promoted for sale, images of her performance. Further, Plaintiff Bosley claims that Defendants used images of her to promote the sale of Defendants' other sexually-related goods.

## 2. *Commercial Purpose*

■ Defendants allege that they did not use images of Catherine Bosley for a commercial purpose. Ohio law defines "commercial purpose" as the use of an individual's persona "in connection with" a "product, merchandise, goods, [or] services." OHIO REV. CODE § 2741.01. At issue in the case is the use of Catherine Bosley's image "in connection with" a product (the video), a service (membership to SexBrat.com), and other merchandise offered by Defendants. Meanwhile, Florida law prohibits the use of one's image "for purposes of trade" or "for any commercial or advertising purpose." FLA. STAT. § 540.08(1). Florida law defines "trade", "commercial", or "advertising purpose" as using a person's name or likeness to directly promote a product or service. *See, e.g., Loft v. Fuller,* 408 So.2d 619, 622–23 (Fla. 4th DCA 1982). Indeed,

---

**6.** Ohio R.C. § 2741.01, describes "persona" and "commercial purpose":

As used in this chapter:
(A)"Persona" means an individual's name, voice, signature, photograph, image, likeness, or distinctive appearance, if any of these aspects have commercial value.

(B)"Commercial purpose" means the use of or reference to an aspect of an individual's persona in any of the following manners: (1) On or in connection with a place, product, merchandise, goods, services, or other commercial activities not expressly exempted under this chapter; . . .

Defendants are using the images of Catherine Bosley to directly promote the sale of videos and memberships.

Defendants request that this Court also look to section 47 of the Restatement (Third) of Competition. This section defines one subset of the prohibited activity, "the purposes of trade," as follows:

> The name, likeness, and other indicia of a person's identity are used "for purposes of trade" under the rule stated in § 46 if they are used in advertising the user's goods or services, or are placed on merchandise marketed by the user, or are used in connection with services rendered by the user.

Nevertheless, even looking to this Restatement for guidance, the Court does not waiver in its conclusion that Defendants used images of Plaintiff Bosley for a commercial purpose. The prominent display of Plaintiff Bosley's name, image, and likeness on the cover of the WildWetT video—as well as promotional images of Plaintiff Bosley posted on WildWetT.com—clearly constitute an advertisement for the video. Meanwhile, the use of images of Catherine Bosley in the "Spring Break 2003" video and in the "members only" portion of SexBrat.com constitute direct promotion of Defendants' products or services.

Defendants argue that their use of Plaintiff Bosley's image should fail under the news, entertainment, and creative works exception. Restatement (Third) of Unfair Competition, § 46, cmt. c (1995). Defendant Marvad argues that their video of the wet t-shirt contest is an expressive work, citing to *Tyne v. Time Warner Entm't. Co., LP*, 204 F.Supp.2d 1338 (M.D.Fla.2002) and *Lane v. M.R.A. Holdings, LLC*, 242 F.Supp.2d 1205 (M.D.Fla. 2002). Although Defendant Marvad would like to draw corollaries between their videos and the book/movie "The Perfect Storm," at issue in *Tyne*, no such similarities exist. The present matter primarily involves the sale of goods, merchandise, and services—not expressive material. "Attempts to defend the sale of such merchandise on first amendment grounds through analogies to the marketing of books, magazines, and other traditional media of communication have typically been rejected." Restatement (Third) of Unfair Competition § 47, cmt. b (internal citation omitted). Moreover, *Lane* is an anomalous case which holds that "it is irrefutable that the *Girls Gone Wild* video is an expressive work created solely for entertainment purposes." *Id.* at 1213. This Court cannot similarly hold that the images in question are expressive works, as they do not contain any creative components or transformative elements. The Court expands upon this discussion in its First Amendment section *infra*, Section II(A)(4).

Defendant Marvad asserts that their videos do not violate the right to publicity because they do not promote products other than the videos themselves. This argument fails. Courts never have interpreted the right to publicity in such a narrow fashion. *See Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 573, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (video tape of cannonball act); *see also Michaels v. Internet Entertainment Group*, 5 F.Supp.2d 823 (C.D.Cal.1998) (sex video tape); *Perfect 10, Inc., v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146 (C.D.Cal. 2002) (pictures of nude models). *Michaels* is helpful in illustrating that a video need not promote a separate product to constitute a commercial use of one's image. In that case, Pamela Anderson Lee and Bret Michaels filed a complaint against an adult internet subscription service which aired clips of their sex tape. Only members, who paid a monthly fee, could access the video in question. Plaintiffs asserted, in

part, that the use of the video clips in this manner violated their right to publicity. The court granted a preliminary injunction and held that the use of the video in this manner did, indeed, constitute a commercial purpose. Similarly, in the present matter, Defendant Dream Girls is attempting to sell a copy of Plaintiff Bosley's performance without her permission. Such a sale is commercial, even if it does not reference Defendants' other wares.

Finally, Defendant Marvad points out that reference to an individual which is merely "incidental to the promotion" of a product does not amount to actionable commercial use. *Vinci v. American Can Co.*, 69 Ohio App.3d 727, 729, 591 N.E.2d 793 (1990). Nevertheless, in the present case, the use of the images of Catherine Bosley are not merely "incidental to the promotion" of the aforementioned products. *Id.* Ultimately, Defendants are unable to persuade this Court that their use of images of Plaintiff Bosley was not commercial.

Defendants have asserted several defenses to establish that Plaintiffs' do not have a substantial likelihood of success on the merits. Defendants Marvad and Dream Girls both allege that their actions fall within the public affair exception and that their actions are protected by the First Amendment. Defendant Dream Girls also asserts the defenses of consent, laches, waiver, and estoppel. The Court will analyze if these defenses defeat Plaintiffs' substantial likelihood of success on the merits.

### 3. Public Affairs Exception

In recognition of the potential clash between the First Amendment and the right of publicity, courts and legislators carve out a public affairs or newsworthiness exception to the right. Defendants assert the legitimate public affairs exception, available to Defendants under both common law and statutory law. Typically, this public affairs exception has applied to the news reports of television and radio productions and the print media.[7] However, precedent in other jurisdictions indicates that a news provider need not be "a traditional news show" to constitute "a 'news or public affairs' broadcast in the broad sense." *Baugh v. CBS, Inc.*, 828 F.Supp. 745, 754 (N.D.Cal.1993). "It makes no difference whether the article appears in a newspaper[,] a magazine[,] a newsreel[,] on television[,] in a motion picture[,] or in a

---

7. *See Jacova v. Southern Radio & Television Co.*, 83 So.2d 34, 37 (Fla.1955) (no common law right of privacy in a news telecast when bystander becomes actor in gambling raid on cigar store); *see also Cape Publications Inc. v. Bridges*, 423 So.2d 426, 428 (Fla. 5th DCA 1982) (publication of newspaper story with a photograph of plaintiff clad in a dish towel after rescue by police from estranged husband did not constitute invasion of privacy); *Stafford v. Hayes*, 327 So.2d 871 (Fla. 1st DCA 1976) (no right of privacy claim when television crew photographed individual at hotel bar after state capitol evacuated by bomb threat); *C.f. Howell v. New York Post Company, Inc.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993) (publication by newspaper of picture of psychiatric patient walking with another well-known patient was pro-

tected as newsworthy); *see also Messenger v. Gruner + Jahr Printing and Publishing*, 208 F.3d 122 (2d Cir.2000) (publisher does not violate statutory prohibition against misappropriation of names and identities for commercial purposes when it uses plaintiff's image in a substantially fictionalized way to illustrated a newsworthy matter); *Fogel v. Forbes*, 500 F.Supp. 1081 (E.D.Pa.1980); *Arrington v. The New York Times Co.*, 55 N.Y.2d 433, 449 N.Y.S.2d 941, 434 N.E.2d 1319 (1982) (use of plaintiff's picture in news article did not violate statute); *Martinez v. Democrat–Herald Publishing Co.*, 64 Or.App. 690, 669 P.2d 818 (1983) (junior high school newspaper did not invade privacy when used a photograph of plaintiff, without her permission, to illustrate a noncommercial, newsworthy article).

book. The test of permissible use is not the currency of the publication of which the picture appears but whether it is illustrative of a matter of legitimate public interest." *Dallesandro v. Holt & Co.*, 4 A.D.2d 470, 471, 166 N.Y.S.2d 805 (1957). In modern times, one could extend this analysis to conclude that information relating to a legitimate public interest on an internet web page is protected communication.

Nevertheless, it is notable that otherwise newsworthy material is not protected in the context of advertising. In regard to the right to publicity, the Ninth Circuit noted:

> While Lew Alcindor's basketball record may be said to be "newsworthy," its use is not automatically privileged. GMC used the information in the context of an automobile advertisement, not in a news or sports account.

*Abdul–Jabbar v. General Motors Corp.*, 85 F.3d 407, 416 (9th Cir.1996). The relevant treatise on the right to publicity echoes these sentiments:

> [U]npermitted use of personal identity, even in connection with news or comment on public issues, will almost never receive immunity from liability for infringement of the right of publicity when the context is linked to brand name. That is, when there is a "mixed message" of "advertising" combined with "news" and/or commentary on public issues, the entire message is labeled "commercial speech" and given the lowest level of constitutional solicitude.
>
> . . . .
>
> For example, if a commercial firm reprints a "news story" from the media and uses it in an advertisement, then this is an advertising use not immunized by the First Amendment from either invasion of appropriation privacy or infringement of the right of publicity.

J. Thomas McCarthy, *The Right of Publicity and Privacy: News or Comment on Public Issues in an Advertising Context*, § 7:4 (2d ed.). *See also Midler v. Ford Motor Co.*, 849 F.2d 460, 462 (9th Cir.1988) ("The purpose of the media's use of a person's identity is central. If the purposes is 'informative or cultural' the use is immune; 'if it serves no such function but merely exploits the individual portrayed, immunity will not be granted.'") (quoting Felcher and Ruben, *Privacy, Publicity and the Portrayal of Real People by the Media*, 88 YALE L.J. 1577, 1596 (1979)).

The Court errs on the side of caution in exempting from review all commentary and news reports in the matter *sub judice*. Thus, this Court will not prohibit Defendants from posting links to newspaper articles or otherwise discussing the Bosley incident. Further, the Court will not prevent Defendants from making any reference at all to Plaintiff Bosley or to the incident in question. This area of the law was not "meant to be construed to bar the use of people's names in such a sweeping fashion." *Loft v. Fuller*, 408 So.2d 619, 623 (Fla. 4th DCA 1981). What is at issue here is the use of video taped *images* of Catherine Bosley.

■ To the extent that Defendants use these images to advertise or promote their goods or services, Plaintiffs do have a substantial likelihood of success on the merits. Advertisements are not protected under this public affairs exception.[8] Under both statutory and common law, forbidden pro-

---

8. *See* OHIO REV. CODE § 2741.02; FLA. STAT. § 540.08; *Zacchini*, 47 Ohio St.2d at 231, 351 N.E.2d 454 (noting that, at common law, it is prohibited to publish one's name or likeness in a manner which draws from that persons "reputation, prestige, or other value associated with him, for purposes of publicity.").

motional uses include forthright advertisements as well as anything else which may constitute "an advertisement in disguise." *Howell,* 81 N.Y.2d at 123, 596 N.Y.S.2d 350, 612 N.E.2d 699 (quoting *Dallesandro,* 4 A.D.2d at 471, 166 N.Y.S.2d 805). The former includes the sale, promotion, and distribution of the video of Catherine Bosley's performance, as well as the sale of images of Catherine Bosley through membership-only websites. Meanwhile, the latter includes images of, or references to, Plaintiff Bosley which are used to promote Defendants' goods or services.

■ It is notable that the standard for determining what constitutes promotional material is quite broad:

> Proof that prospective purchasers are likely to believe that the identified person endorses or sponsors the user's goods or services is not required for the imposition of liability. Thus, the unauthorized use of another's name or likeness in newspaper or magazine advertisements, in television or radio commercials, or in other solicitations of prospective purchasers will ordinarily subject the user to liability for infringement of the other's right of publicity.

Restatement (Third) of Unfair Competition, § 46, cmt. a (1995). Furthermore, it is not necessary to establish that Defendants actually intended to use an image or likeness of Plaintiff in a promotional manner to establish a violation of Plaintiff's right to publicity. *Id.* at cmt. b, illus. 2 ("A defendant may be subject to liability under the rule stated in § 46 even if the violation of the plaintiff's rights is unintentional.").

### 4. First Amendment

■ Along this same line, Defendants also assert that their use of images of Plaintiff Bosley is protected under the First Amendment of the United States Constitution. Defendants seem to align themselves with Justice Black's "absolute" position that the First Amendment meant only what it literally said: There shall be no law restricting freedom of speech—ever—with no "ifs, buts, or whereases." *Beauharnais v. People of State of Ill.,* 343 U.S. 250, 275, 72 S.Ct. 725, 96 L.Ed. 919 (1952) (Black, J., dissenting). However, the Supreme Court never adopted this position. There are several limitations as to what constitutes constitutionally protected speech. For example, one may build upon the ideas of others as part of public discourse, but these interests are balanced against copyright and patent laws. Similar proprietary interests are at stake in this case. *See Zacchini,* 433 U.S. at 573, 97 S.Ct. 2849 ("[T]he State's interest in permitting a 'right of publicity' is in protecting the proprietary interest of the individual . . . . [which] is closely analogous to the goals of patent and copyright law . . .").

Moreover, the realm of commercial speech is an area of limited protection under the First Amendment. *Virginia St. Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Within this realm of already limited protections, there are areas of commercial activity which the First Amendment does not protect at all. For example, the First Amendment does not shield from liability commercial messages which contain misleading material or relate to illegal activity:

> The First Amendment's concern for commercial speech is based on the informational function of advertising . . . . Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to

deceive the public than to inform it, ... or commercial speech related to illegal activity .... For commercial speech to come within that provision [the First Amendment], it at least must concern lawful activity and not be misleading. *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York,* 447 U.S. 557, 563–66, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Similarly, the informational function of advertising is impaired when one wrongfully appropriates another's image for commercial purposes. The underlying deception is the myth that an individual actually endorses or supports a product when, in fact, she does not. *See, e.g., Zacchini,* 47 Ohio St.2d at 231, 351 N.E.2d 454. Consequently, those who violate one's right to publicity are not automatically shielded from liability by the First Amendment.

It is notable that, at common law, the right to publicity also extends to unauthorized publication which is not purely commercial. *Zacchini,* 433 U.S. 562, 97 S.Ct. 2849. Nevertheless, even outside this commercial realm, the First Amendment would not necessarily shield Defendants from liability:

> It is important to remember that even if the accused communication is classified, not as "commercial speech," but as full-fledged communicative speech, the First Amendment does not automatically and of its own weight crush any and all assertions of the right of publicity. Rather, the First Amendment values of free speech are balanced on a case by case basis against the right of publicity values.

J. Thomas McCarthy, *The Right of Publicity and Privacy: Balancing Free Speech Against Other Rights,* § 8.23.

### a. Balancing the First Amendment with the Right to Publicity

Case law helps to illuminate the balance between the First Amendment and the right to publicity. In *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), the Supreme Court held that the First and Fourteenth Amendments *do not* immunize defendants from damages for alleged infringement of the right to publicity. In that case, a news station broadcast Hugo Zacchini's entire fifteen second "human cannonball" act. Similar to the case at hand, the performance took place in a public arena—a public fair ground.

Upon review, the Ohio Supreme Court held that news reporters covering matters related to the public interest are privileged from suits based on violations of the right to publicity, unless they had actual intent to injure the individual or to appropriate one's persona. *Zacchini,* 47 Ohio St.2d at 224, 351 N.E.2d 454. In essence, this holding would have extended the "actual malice" standard from *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) to appropriation of the right of publicity. The United States Supreme Court flatly rejected such a holding. *Id.* at 574, 97 S.Ct. 2849. "We conclude that although the State of Ohio may as a matter of its own law privilege the press in the circumstances of this case, the First and Fourteenth Amendments do not require it to do so." *Id.* at 578–79, 84 S.Ct. 710.

To date, *Zacchini* is the only United States Supreme Court decision on the right of publicity. It is notable that *Zacchini* expressly rejects many of Defendants arguments. Namely, *Zacchini* establishes that one does not have absolute license to re-broadcast all images of public figures which occur in a public forum. Defendants' insistence that the public nature of Plaintiff Bosley's acts ought to control is ill-founded. Additionally, the Supreme

Court also considered the balance between the right to publicity and the First Amendment. The Supreme Court indicated that the right to publicity was constitutional and did comport with the First Amendment.

Defendants argue that the Sixth Circuit's opinion in *ETW Corp.* is more relevant than *Zacchini* in clarifying the role of the First Amendment in cases involving the right to publicity. A close analysis of this case reveals that it is not controlling in the present matter. In *ETW Corp.*, the painter Rick Rush created a painting of Tiger Woods at the 1997 Masters Tournament, when Woods became the youngest player to win the tournament. The painting included a collage of images, including images of Tiger Woods in different poses. Commentary about the event accompanied the painting. *ETW Corp.*, 332 F.3d at 918–19. Rush licensed the painting to Jireh Publishing for the purpose of making prints for sale to the general public. Tiger Woods sued Jireh Publishing, in part, alleging that the painting violated his right to publicity. Defendant raised a First Amendment defense, alleging that the prints were protected speech "because they are art works and do not constitute commercial speech." *ETW Corp. v. Jireh Publ'g, Inc.*, 99 F.Supp.2d 829, 834 (N.D.Ohio 2000). The Sixth Circuit held that the painting was indeed protected by the First Amendment: "In this case, we find that Woods's right of publicity must yield to the First Amendment." *Id.* at 938.

Nevertheless, *ETW Corp* did not directly address the role of the First Amendment, in cases such as the matter *sub judice*, where the material in question primarily involved advertising. However, the Sixth Circuit did hint that it would come out differently in such a case. The Sixth Circuit quoted a California Supreme Court case which emphasized that the items in question were "expressive works and not an advertisement or endorsement of a product." *Id.* at 935 (quoting *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 387, 106 Cal.Rptr.2d 126, 21 P.3d 797 (2001)).

Most importantly, *ETW Corp.* promulgates a definition of expressive material which would not extend to the images of Catherine Bosley in the present matter. The Sixth Circuit emphasized the fact that the painting in question was the work of an artist, that it was "more than a mere literal likeness of Woods," *id.* at 937, that it involved a "collage of images," *id.* at 938, and, finally, that the artist's labor "added a significant creative component of his own to Woods's identity." *Id.*

In contrast, the images of Catherine Bosley are not sufficiently altered to reflect a creative component which was added to the images of Bosley. This Court viewed the two video tapes in question, as well as the video clips placed on the "members only" portion of SexBrat.com. The images merely capture Plaintiff Bosley's performance at the wet t-shirt contest and do not contain any editorial content. The substance of images were not accompanied by any dialog discussing Plaintiff's status as a former news anchor.

The lack of artistic expression and significant editorial comments clearly distinguish this case from other cases where First Amendment protections have applied. *See e.g., Cardtoons, L.C. v. Major League Baseball Players Assoc.*, 95 F.3d 959, 976 (10th Cir.1996) (holding that the First Amendment protected trading cards which involved caricatures of major league baseball players and humorous commentary because the cards "added a significant creative component of its own to the celebrity identity and created an entirely new product."). For example, the District of

New Jersey, in *Estate of Presley v. Russen,* 513 F.Supp. 1339 (1981), distinguished expressive material from material which is a mere copy of someone else's expression. In that case, the court considered the relationship between the right to publicity and the First Amendment when determining whether to grant a preliminary injunction to enjoin defendant from hosting an Elvis impersonation concert. The court ultimately granted the preliminary injunction and rejected the argument that the concert was expressive material. "[E]ntertainment that is merely a copy or imitation, even if skillfully and accurately carried out, does not really have its own creative component and does not have a significant value as pure entertainment." *Id.* at 1359. Similarly, in the case *sub judice,* the images of Catherine Bosley are mere copies of Catherine Bosley's performance and are not protected material.

Further, the California Supreme Court's decision in *Comedy III Pros., Inc. v. Gary Saderup, Inc.,* 25 Cal.4th 387, 106 Cal. Rptr.2d 126, 21 P.3d 797 (2001) is also on point. In that case, the defendant drew a picture of the Three Stooges and silk screened the picture onto T-shirts for sale. The registered owner of all rights of the Three Stooges sued defendants for violation of the right to publicity. The defendant asserted the First Amendment as an affirmative defense. The *Comedy III* court concluded that the a mere copy of the image of the celebrity does not receive First Amendment protection unless the image is *transformative:*

> [W]hen an artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame, then the artist's right of free expression is outweighed by the right of publicity. As is the case with fair use in the area of copyright law, an artist depicting a celebrity must

> contribute something more than a " 'merely trivial' variation, [but must create] something recognizably 'his own' " [citation omitted], in order to qualify for legal protection.

*Id.* 106 Cal.Rptr.2d 126, 21 P.3d at 810–11. (quoting *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486, 490 (2d Cir.1976)). The Supreme Court of California concluded that the silk screening was not entitled to First Amendment protection.

Similarly, in the present case, the images of Catherine Bosley do not contain any transformative elements. It appears that Defendants are using the images of Plaintiff Bosley solely for the purpose of commercially exploiting her fame.

### b. Commercial Speech

For the reasons stated above, this Court concludes that if any speech interest is at issue here, it is commercial speech. Of concern here is the use of Catherine Bosley's image to sell video tapes and website memberships. The images do not contain "a significant creative component" so that they can be said to constitute expressive material. *ETW Corp. v. Jireh Publ'g, Inc.,* 332 F.3d 915, 938 (6th Cir.2003). At its core, Defendants are selling Plaintiff's image for a profit without including a message of their own. "[T]here are common-sense differences between speech that does no more than propose a commercial transaction and other varieties." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (quotations and citation omitted). Common sense dictates that the use of images of Plaintiff Bosley to sell video tapes, website memberships, or defendants' other wares, at most, constitute commercial speech.

The Supreme Court has noted that "advertising which 'links a product to a cur-

rent public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 67–68, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (holding that "information pamphlets are properly characterized as commercial speech.") "Thus, it seems that the Supreme Court will denominate a mix of advertising, news, social comment and entertainment as 'commercial speech' subject to the lower level of constitutional protection." J. Thomas McCarthy, *The Rights of Publicity and Privacy: Mixed Commercial and Communicative Messages,* § 8:97 (2d ed.). In the present matter, the sale of images of Plaintiff Bosley are not " 'inextricably entwined' with expressive elements . . . so they cannot be separated out 'from the fully protected whole' ". *Hoffman v. Capital Cities/ABC, Inc.,* 255 F.3d 1180, 1185 (9th Cir.2001) (quoting *Gaudiya Vaishnava Soc'y v. City & County of San Francisco,* 952 F.2d 1059, 1064 (9th Cir. 1990) (as amended)).

Defendant Marvad attempts to characterize its use of the video clips of Plaintiff Bosley as non-commercial. Defendant Marvad sells the images of Plaintiff Bosley through an adult internet subscription service, at a rate of $37.12 a month. Defendant Marvad points out that members can access an array of adult entertainment material once they subscribe to the service, arguing that the use of any one image is not commercial. The Court finds this argument to be unpersuasive. The Central District of California considered a similar fact pattern in *Michaels,* 5 F.Supp.2d 823. In *Michaels,* an internet website, ClubLove, was to air the sex tape of Pamela Anderson Lee. Members would access the video (along with other images) on the "members only" portion of ClubLove; membership cost $14.95 per month. *Id.* at 837. The court granted a preliminary injunction against the website, noting that

the "promotion, marketing, and advertising" of the tape constituted commercial speech which "proposes a commercial transaction." *Id.* at 839 (quoting *Board of Trustees of the State University of New York v. Fox,* 492 U.S. 469, 482, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). Similarly, in the present matter, the images sold on an adult internet subscription service, at most, constitute commercial speech.

Ultimately, this Court finds that the First Amendment defense fails. The images of Plaintiff Bosley do not contain expressive or editorial content. Further, even if Defendants could convince this Court that the images are protected under the First Amendment as commercial speech, limitations imposed by the right to publicity would comport with the First Amendment. Laws governing the right to publicity have a substantial interest in regulating commercial speech. Individuals have a property right in their own identity. Allowing individuals the exclusive right to capitalize on their persona, like copyright law, encourages them to invest in developing their skills and talents. The right to publicity prevents others from depleting the economic value of one's persona without internalizing the costs. Furthermore, the right to publicity helps prevent deceptive commercial uses. In turn, remedies under the law advance that governmental interest without being more extensive than necessary. *See Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (articulating a four part test to bring commercial speech within the protection of the First Amendment). Thus, First Amendment grounds are not sufficient to overcome Plaintiffs' substantial likelihood of success on the merits.

*c. Prior restraint*

█ Defendants attempt to argue that injunctive relief would constitute prior re-

straint of speech. In doing so, Defendants assert that, instead of merely applying the traditional four-part test to determine if a preliminary injunction is appropriate, "the hurdle is substantially higher ... publication must threaten an interest more fundamental than the First Amendment itself." *County Sec. Agency v. Ohio DOC*, 296 F.3d 477 (quoting *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226–27 (6th Cir.1996)).

However, the United States Supreme Court has indicated that the prior restraint doctrine is *inapplicable* to commercial speech. "We have observed that commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it." *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 571, n. 13, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (quoting *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)) ("[T]he greater objectivity and hardiness of commercial speech [ ] may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker ... They may also make inapplicable the prohibition against prior restraints.") *See also Zauderer v. Office of Disciplinary Counsel of the Supreme Court*, 471 U.S. 626, 668, n. 13, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) ("The Court previously has noted that, because traditional prior restraint principles do not fully apply to commercial speech, a State may require 'a system of previewing advertising campaigns to ensure that they will not defeat state restrictions.' ") (quoting *Central Hudson*, 447 U.S. at 571, n. 13, 100 S.Ct. 2343.).

The vast majority of circuits, including the Sixth Circuit Court of Appeals, do not apply the doctrine of prior restraints to commercial speech:

> [T]he different nature of commercial speech from noncommercial speech circumscribes to some extent the level of First Amendment protection afforded it. For example, the overbreadth doctrine permitting jus tertii and the prohibition against prior restraints *have no force in the context of commercial speech.*

*Record Revolution No. 6 v. Parma*, 638 F.2d 916, 936 (6th Cir.1980) (emphasis added) (rev'd on other grounds).

For example, the *Michaels* court granted a preliminary injunction in a factually similar case. The court noted that so long as it limited its preliminary injunction to "commercial transactions" and not "speech that comments on the matter" it would not run afoul of the prior restraint doctrine. *Id.* at 838–39. The present matter similarly deals with commercial and not expressive elements of speech. There have been numerous other cases involving the right to publicity where courts have granted preliminary injunctions. *See, e.g., Bi–Rite Enterprises, Inc. v. Bruce Miner Poster Co.*, 616 F.Supp. 71 (D.Mass.1984), *aff'd* 757 F.2d 440 (1st Cir.1985); *Ali v. Playgirl, Inc.*, 447 F.Supp. 723 (S.D.N.Y.1978); *Aguilar v. Ragusa*, 174 A.D.2d 1002, 572 N.Y.S.2d 164 (N.Y.App.Div.1991); *Onassis v. Christian Dior–New York, Inc.*, 122 Misc.2d 603, 472 N.Y.S.2d 254 (N.Y.Sup. 1984); *Reilly v. Rapperswill Corp.*, 50 A.D.2d 342, 377 N.Y.S.2d 488 (N.Y.App. Div.1975).

■ Furthermore, it is well-settled law that the prior restraint doctrine is inapplicable in cases where one's proprietary interests are at stake, such as infringements of copyright or trademark. *See e.g., Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184 (5th Cir.1979). In upholding a preliminary injunction in a case involving a potential copyright infringement, the Fifth Circuit noted that "[t]he first amendment is not a

license to trammel on legally recognized rights in intellectual property." *Id.* at 1188 (*citing Zacchini,* 433 U.S. at 577, 97 S.Ct. 2849). Similarly, the right to publicity is "closely analogous to the goals of patent an copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feelings or reputation." *Zacchini,* 433 U.S. at 573, 97 S.Ct. 2849.

Moreover, the controlling treatise on the right to publicity notes that the right, as a whole, may not be subject to the prior restraint doctrine.

> [W]here truth or falsity is not in issue, such as with ... commercial appropriation, the heavy presumption against prior restraints is not always applicable. In such cases, injunctions to stop such conduct have been granted. The injury remedied by injunction in such cases is not injury to personal reputation caused by falsity, but injury to human dignity and peach of mind caused by ... commercial use. In many such privacy cases, it is not alleged falsity which may injure plaintiff, but the conduct of defendant.

J. Thomas McCarthy, *The Right of Publicity and Privacy: Prior Restraint Rule,* § 11.24 (2d ed.). D (internal citations omitted).

### 5. Consent

 Additionally, Defendant Dream Girls alleges that Plaintiff Bosley consented to the commercial use of her likeness or image. Defendants state that there were signs posted around the dressing room, stage, entrances, and exits notifying participants about the future commercial use of their image:

> NOTICE: The event you have entered is being filmed by a video production company. By entering the 'stage' beyond this sign, you are hereby consenting and agreeing to your picture and image being used for any reproduction of any type and sale without any further compensation.

Defendant Dream Girl claims that the emcee of the contest at issue, Mr. James Hayden, announced for the loudspeaker that the event was being filmed for a Dream Girls production.

Defendant Dream Girl comes forward with strong evidence that Plaintiff Bosley impliedly consented to being photographed. Dream Girl shows a large number of pictures with Bosley positioned within feet of Dream Girl's camera and looking directly into the camera's lens. Given the relatively large size of the camera, Dream Girls shows evidence that Bosley impliedly consented to being photographed.

However, this does not constitute a defense under the law. Assuming arguendo that the more lenient Florida standard for consent applies, Defendants, at the very least, must establish *explicit* oral consent from the plaintiff. See FLA. STAT. § 540.08. Tacit consent is not sufficient as a matter of law. The face of the statute specifically requires "*express* written or oral consent." FLA. STAT. § 540.08(1) (emphasis added). See, Restatement (Third) of Unfair Competition, § 46, cmt. f (1995) ("*In the absence of an applicable statute* requiring consent in writing, consent can also be implied from conduct or inaction reasonably interpreted as manifesting consent.")

Defendant Dream Girls argues that "Florida case law interpreting the statute relaxes" the requirements of the statute, citing to *Lane,* 242 F.Supp.2d 1205. (Def. Dream Girls br. at 18). In *Lane,* individuals with a video camera requested two minor girls expose themselves in exchange for beaded necklaces. *Id.* at 1209. The minors agreed and the individuals filmed

the encounter. Before the minors removed their clothing, Lane's companion noted that, in a similar incident, she had been photographed at Mardi Gras and the pictures had been published in *Maxim*, a popular men's magazine. Subsequent to the encounter, Lane began seeing images of herself on *Girls Gone Wild* advertisements. As a result, Lane brought suit alleging, in part, a violation of her right to publicity. Lane alleged that she consented to the filming for the camera man's personal use, but was unaware that she would become part of productions like *Girls Gone Wild. Id.* at 1220.

The Middle District of Florida found that "no reasonable jury could conclude that Lane's consent limited the viewing . . ." *Id.* The Court emphasized the fact that Lane's companion had put her on notice that the cameramen might use the images for commercial use. *Id.* Thus, the Court held that there was no dispute of fact that Lane had consented to the broad use of her images.

*Lane* differs from the present case. In *Lane*, there was no dispute of fact that the plaintiff expressly consented to being video taped. In contrast, Plaintiff Bosley asserts that she did not view any video cameras or otherwise receive notice that Dream Girls filmed the contest. Therefore, *Lane* merely dealt with the narrow issue of how far-reaching the plaintiff's consent was once given: Did the consent to be video taped extend to all foreseeable uses of that video tape? The *Lane* court answered that question affirmatively. Meanwhile, the present matter deals with a much more fundamental question: Did the Plaintiff Bosley consent to be video taped?

Moreover, the holding in *Lane* does not trump Florida statutory law. As a procedural matter, this Court notes that it may not rely on a case out of the Middle District of Florida to determine the status of Florida law. Rather, only the decisions of the Florida Supreme Court are determinative. The Court especially proceeds with caution, in a situation such as this, where defense counsel argues for an interpretation of the law which directly contradicts the language of the statute. In the absence of any compelling evidence to the contrary, this Court holds that the requirement of "express written or oral consent" FLA. STAT. § 540.08(1) means just what it says. Tacit consent is insufficient as a matter of law.

The Court is similarly unpersuaded by Defendant Dream Girls' argument that one's right to publicity is somehow confined to areas where one has a reasonable expectation of privacy. Defendant argues that consent to the commercial use of one's persona somehow can be presumed in areas where one does not have an expectation of privacy. As described, *supra*, the United States Supreme Court has flatly rejected this proposition. *Zacchini*, 433 U.S. 562, 97 S.Ct. 2849.

### 6. *Laches/Waiver/Estoppel*

Lastly, Defendant Dream Girls asserts the doctrines of laches, waiver, and estoppel. First, Defendant Dream Girls argues, under the doctrine of laches, that Plaintiff unreasonably delayed almost a year in bringing this suit, despite having knowledge or notice of defendant's conduct. Under Ohio law, to invoke the doctrine of laches, Defendant mush show "(1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party." *Thirty–Four Corp. v. Sixty–Seven Corp.*, 15 Ohio St.3d 350, 353, 474 N.E.2d 295 (1984). Meanwhile, under Florida law, Defendant must show (1) conduct on the part of the

defendant giving rise to the situation of which complaint is raised; (2) delay in asserting the plaintiffs rights, the plaintiff having had knowledge or notice of the defendant's conduct and having been afforded an opportunity to institute the suite; (3) lack of knowledge or notice on the part of the defendant that the plaintiff would assert the right on which he bases his suit; and (4) injury or prejudice to the defendant in the event relief is accorded to the plaintiff. *The Florida Bar v. Lipman*, 497 So.2d 1165, 1167 (Fla.1986).

■ Defendant Dream Girls cannot establish, under Ohio or Florida law, that Plaintiff Bosley had knowledge or notice of the conduct which gave rise to the suit for a significant period of time before filing this action. Therefore, there is no cognizable delay. The conduct at issue here is not the dissemination of images of Plaintiff Bosley without charge. Rather, the relevant inquiry here is the moment at which Plaintiff Bosley had notice that Defendant Dream Girls was selling video tapes of her performance. Defendant Dream Girls argues that Plaintiff Bosley was put on notice of Defendant's commercial use of her image due to the circumstances surrounding the March 8, 2003 wet t-shirt contest, including the posting of signs. There are material disputes of fact regarding the circumstances surrounding the contest. However, even if Defendant's version of the evening proves decisive, a lawsuit would not be ripe until Defendant was indeed commercially using Plaintiff Bosley's image. This did not occur until after the contest. Plaintiff Bosley avers that she first knew about the commercial sale of her image, in the form of a video tape, in late December, 2003. Indeed, it was reasonable for Plaintiff not to be put on notice before this date due to the fact that the existence of the video tape, and Plaintiff Bosley's appearance on the tape, had

not yet received widespread attention. Shortly after receiving notice of the video tape, Plaintiff Bosley filed this lawsuit on February 26, 2004. Ultimately, Defendant Dream Girls cannot successfully invoke the doctrine of laches.

■ Second, Defendant Dream Girls claims that Plaintiff Bosley's waived her right to publicity. Defendant argues that Plaintiff Bosley's actions in participating in the wet t-shirt contest and talking to the media constitute a waiver. However, the right to publicity is not coterminous with the right to privacy. Although Plaintiff Bosley may have relinquished certain aspects of her right to privacy, her actions do not imply that she intentionally or voluntarily relinquished the right to be free from the appropriation of her persona for another's gain.

■ Third, Defendant Dream Girls asserts that Plaintiff is now estopped from bringing this lawsuit. Once more, the Defendant points to Plaintiff Bosley's participation in the wet t-shirt contest and her contact with the media. Even if Defendant Dream Girls could establish that it relied on such behavior as an assurance that Plaintiff Bosley would not later assert her right to publicity, such a reliance would be unreasonable.

Ultimately, the defenses proffered by Defendants do not overcome Plaintiffs' substantial likelihood of victory on the merits of the case.

### B. Irreparable Harm to Plaintiff

Next, this Court examines whether Plaintiffs have shown a likelihood of irreparable harm. Plaintiff Bosley alleges that the dissemination of her likeness will significantly impair her ability to protect her commercial interest in the use of her persona. In response, Defendant Marvad argues that Plaintiff Bosley's performance

"has already received a great deal of publicity, [so] there will be no further harm to Plaintiff by allowing Marvad to publish them as well." (Def. Marvad br. at 16). Further, it is true that Plaintiff already has suffered the loss of her job, which a preliminary injunction could not correct.

 Thus, the Court narrowly examines whether a preliminary injunction is necessary to prevent irreparable *future* harm. The Court finds that the continued dissemination of the material in question would likely impinge upon future attempts of Plaintiff Bosley to secure comparable employment. Additionally, without a preliminary injunction, it may become impossible for Plaintiff to minimize lasting damages to her persona. Although Plaintiff Bosley already has sought employment unsuccessfully, this Court cannot speculate as to how long Plaintiff can go unemployed before she becomes virtually unmarketable. However, it is likely that the sooner Plaintiff Bosley is able to regain control of her persona, the more likely she is to be able to turn around her career. Indeed, if the Court allows Defendants to continue using images of Catherine Bosely for commercial purposes, it cannot later undue the additional harm caused to Plaintiff's persona. A preliminary injunction is necessary to prevent immediate and irreparable loss to Plaintiff Bosley—namely, the further eroding of her professional and personal persona. The Court finds, therefore, that Plaintiffs will be irreparably harmed if no injunctive relief is granted.

## C. Harm Caused by Injunction

Conversely, Defendants' claim that they will be harmed if injunctive relief is granted. Defendant Marvad estimates that its membership base will decrease dramatically as a result of not being able to display clips of the Catherine Bosley video. Marvad estimates that during the time to proceed to trial it would lose $100,000 in revenue. (Def. Marvad br. at 20–21). However, Defendant Marvad does not support this claim with empirical evidence. Meanwhile, Defendant Dream Girls has not given this Court any estimates with regard its damages.

Ultimately, any harm to Defendants is not irreparable. Should Defendants prevail in this action, they can once more tout for sale images of Catherine Bosley and recoup any lost profits. Moreover, the Court finds that the harm to Plaintiffs in being unable to undue any harm to Plaintiff Bosley's persona outweighs the harm to Defendants by curtailing the sale of the material in question.

## D. The Public Interest

The public interest is best served when the commercial value of one's persona is not exploited. As the Supreme Court has noted, "No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." *Zacchini*, 433 U.S. at 576, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (internal quotation omitted).

Furthermore, a temporary restraining order would not chill public discourse or a free press. The public and the press are free to vigorously debate the responsibility of public figures and the implications of the incident in question.

In light of the foregoing, the Court grants Plaintiff's motion for a preliminary injunction.

## E. Scope of Injunctive Relief

 Defendants Marvad and Dream Girls request that this Court limit its injunctive relief to the state of Ohio. Defendants argue that injunctive relief should not extend to states which do not recog-

nize a right of publicity, or to states where Plaintiffs would not otherwise meet the requirements for establishing a violation of the right of publicity. While *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.,* 270 F.3d 298, 327 (6th Cir.2001) is on point here, Defendants cite this case as standing for a much broader proposition than it actually does.

In *Herman Miller,* the Sixth Circuit struck down a permanent, nationwide injunction in a right to publicity case. In that case, a manufacturer had obtained the right to publicity to furniture designed by Charles and Ray Eames. However, after the death of Charles and Ray Eames, a furniture company based in New York City began marketing a reproduction of Eames-designed furniture. The Eastern District of Michigan granted a nationwide, permanent injunction against the use of the Eames-designed furniture.

The Sixth Circuit struck down the injunction, noting that "[i]t would be unjust to impose Michigan law on [the furniture company's] operations in New York and other states that explicitly have refused to recognize a post-mortem right of publicity." *Id.* at 327. However, that the Sixth Circuit did not limit injunctive relief to just Michigan. Instead, the Sixth Circuit only excluded from the injunction those states which explicitly had refused to recognize the post-mortem right to publicity. The injunction continued to apply to those states which had not made any determination on the matter. *Id.*

Thus, Defendants wrongly rely on *Herman Miller* as standing for the proposition that injunctive relief in the present case ought to be restricted to Ohio. The Sixth Circuit never has stated that relief must be restrained within the strict territorial boundaries of one state. This revival of *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877) would result in a judicially unmanageable rule. "Such a procedure might force a plaintiff to bring suits in all fifty states in an attempt to vindicate his common law rights in all jurisdictions." Paul Heald, *Unfair Competition and Federal Law: Constitutional Restraints on the Scope of State Law,* 54 U. CHI. L. REV. 1411, 1428 (1987).

This Court agrees, however, that pursuant to *Herman Miller* it must limit injunctive relief to jurisdictions which explicitly do not reject the right to publicity or the appropriation branch of the right to privacy. However, unlike the question of a post-mortem right to publicity, all fifty states of the United States recognize the right to be free from the appropriation of one's persona in some form.

Recognition of the right to privacy, including the appropriation branch of the right, is nearly unanimous across the states. Meanwhile, twenty-eight states have recognized "the right to publicity" either under statute or common law. Only Nebraska and New York expressly rejected a common law right to publicity, but both of those states later recognized a right to publicity with statutory enactments. J. Thomas McCarthy, *The Rights of Publicity and Privacy,* § § 6.1–6.3 (2d ed.). In fact, of the United States territories, only Puerto Rico currently rejects the right to publicity. *Guedes v. Martinez,* 131 F.Supp.2d 272 (D.P.R.2001). Furthermore, the tenants of the right to be free from the appropriation of one's persona, whether it be vested in the right to privacy or the right to publicity, do not vary significantly across state lines. Therefore, the present injunction is limited to United States territories, excluding Puerto Rico.

**F. Bond**

 Federal Rule of Civil Procedure 65(c) requires a preliminary injunction applicant to post a bond "in such sum as the

court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The security requirement of Rule 65(c) informs the applicant "the price it can expect to pay if the injunction was wrongfully issued." *Sprint Communications Co. v. Cat Communications Int'l,* 335 F.3d 235, 240 (3d Cir.2003) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 805 (3d Cir.1989)). In this manner, the applicant may base its decision to accept the injunction "on whether it wants to expose itself to liability up to the bond amount." *Id.*

While the language of Rule 65(c) appears to be mandatory, "the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle–Picher Indus., Inc.,* 55 F.3d 1171, 1176 (6th Cir.1995) (citing *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 539 (6th Cir.1978)). For example, the Sixth Circuit has upheld a district court's waiver of a bond requirement where the district court determined that the plaintiff had a strong case, backed by strong public interest. *Id.* Additionally, courts have appropriately waived a bond requirement where defendants' damages are merely speculative. *See Elite Licensing, Inc. v. Thomas Plastics, Inc.,* 250 F.Supp.2d 372, 391 (S.D.N.Y. 2003) ("The district court may dispense altogether with the filing of a bond where there has been no proof of likelihood of harm.") (citing *Ferguson v. Tabah,* 288 F.2d 665, 675 (2d Cir.1961)).

In the present matter, Defendants provide this Court with scant evidence regarding the harm they will suffer harm as a result of a preliminary injunction later found to have been improvidently issued. At hearing, both Marvad and Dream Girls professed to have received very little profit from their use of the Bosley materials. In addition, both claimed that Bosley period of public attraction had largely passed. Defendant Dream Girls has not provided this Court with any information with regard to a bond. Given the lack of evidence that Defendants will suffer damages should the Court issue a preliminary injunction in error, this Court sets a low bond of one hundred dollars ($100).

### III. CONCLUSION AND ORDER

The Court hereby enjoins Defendants from selling, distributing for sale, promoting for sale, or placing on "members only" websites any and all images of Plaintiff Catherine Bosley, in the form of videotapes, DVD recordings, pictures, photographs, or other likeness or depiction of Plaintiff Bosley. The Court enjoins Defendants Dream Girls and Marvad from using any other image, picture, photograph, likeness, or depiction of Plaintiff Bosley in a manner which promotes the sale of Defendants' goods or services.

IT IS SO ORDERED.