**BI–RITE ENTERPRISES, INC., et al., Plaintiffs, Appellees,**

v.

**BRUCE MINER COMPANY, INC., et al., Defendants, Appellants.**

No. 84–1361.

United States Court of Appeals, First Circuit.

Argued Oct. 3, 1984.

Decided March 22, 1985.

---

**2.** Emphasis supplied.

Jerry Cohen, Boston, Mass., with whom M. Lawrence Oliverio, Quincy, Mass., Mark A. Fischer, and Cohen & Burg, Boston, Mass., were on brief, for defendants, appellants.

Jules D. Zalon, Orange, N.J., with whom David J. O'Driscoll, Orange, N.J., was on brief, for plaintiffs, appellees.

Before COFFIN and BOWNES, Circuit Judges, and WEIGEL,* Senior District Judge.

WEIGEL, Senior District Judge.

This is an appeal from a preliminary injunction prohibiting distribution of posters depicting certain popular music performers.[1]

Plaintiffs Bi-Rite Enterprises Inc. (Bi-Rite), an Illinois corporation, and Artemis, Inc. (Artemis), a Connecticut corporation, are manufacturers and distributors of novelty merchandise. Their wares include posters of British popular music performers from whom they hold exclusive licenses.

There are also fourteen individual plaintiffs, all residents of Great Britain. Each is a member of one or another of the popular musical groups known as Judas Priest, Duran Duran, and Iron Maiden. The groups license commercial exploitation of their names and likenesses through their United States merchandizing representative, the Great Southern Company, Inc., a Georgia corporation, which is not a party here.

The defendants, Bruce Miner and Bruce Miner Co., Inc., a Massachusetts corporation, are in the business of distributing posters of popular music performers. Neither the defendants nor the European manufacturers from whom they purchase posters hold licenses from the depicted performers. Defendants claim that the posters they distribute were made from publicity photographs legally purchased by the European manufacturers.

The preliminary injunction prohibits defendants from distributing posters depicting any of the performers from whom Bi-Rite or Artemis holds an exclusive license for posters. It also prohibits distribution

---

* Of the Northern District of California, sitting by designation.

1. Defendants do not challenge the preliminary injunction's prohibition relating to distribution of posters depicting American performers.

of posters depicting the individual plaintiffs.

The sole question on appeal is whether, under Massachusetts law, rights relating to commercial exploitation of a person's name or likeness are governed by the law of the person's domicile or by that of the residence of the person's exclusive licensee or merchandizing representative. The law of Great Britain does not recognize a right to control commercial exploitation of personal names or likenesses. The law of the American jurisdictions here involved does recognize that right. The district court applied the law of the American jurisdictions.

We affirm.

### I.

American jurisdictions have recently recognized the right of well known individuals to control commercial exploitation of their names and likenesses. Called "the right of publicity," *Haelan Laboratories v. Topps Chewing Gum,* 202 F.2d 866, 868 (2d Cir. 1953), or the tort of "appropriation" of name or likeness, *Prosser and Keeton on The Law of Torts* (5th ed. 1984) at 851, this right has been recognized in some form by virtually all states. *See id.* at 850–51. As a commercial, rather than a personal right, it is fully assignable.

> [T]he effect ... is to recognize or create an exclusive right in the individual plaintiff to a species of trade name, his own, and a kind of trade mark in his likeness.... Once protected by law, it is a right of value upon which the plaintiff can capitalize by selling licenses.

*Prosser and Keeton on The Law of Torts* (5th ed. 1984) at 854.

Great Britain does not recognize a right of publicity. *See Tolley v. Fry,* 1 K.B. 467 (1930). Consequently, the choice between

United States and British law is determinative in this case.

### II.

When a federal court exercises pendent jurisdiction over state law claims, as here, it must apply the substantive law of the state in which it sits. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (citing *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). This includes the forum state's choice of law rules. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), *reaffirmed, Day & Zimmerman, Inc. v. Challoner,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975). Thus, we must determine what law the Massachusetts courts would apply.

As in most American jurisdictions, Massachusetts' choice of law rules are in transition. The state has turned away from the rigid, single-factor analysis associated with the first *Restatement of Conflict of Laws* (1934) in favor of the more flexible, multiple-factor, "interest analysis" or "most significant relationship" analysis exemplified by the *Restatement (Second) of Conflict of Laws* (1971). *Compare Cameron v. Gunstock Acres, Inc.,* 370 Mass. 378, 381–82, 348 N.E.2d 791, 793 (1976) (applying single-factor test) *with Choate, Hall & Stewart v. SCA Servs., Inc.,* 378 Mass. 535, 541, 392 N.E.2d 1045, 1048–49 (1979) (announcing "more functional" approach). Under the older approach, courts determined which jurisdiction's law governed by categorizing an action (as a tort, contract, or property dispute, for example) and then looking to a single connecting factor (such as place of injury, place of agreement, or situs of property).[2]

---

2. The "right of publicity" does not fit neatly into any of the categories—Tort, Property, Contract, etc.—which provided the framework for traditional (First Restatement) choice of law analysis. The alleged infringement in the present action implicates elements of both Tort and Property law. *Cf. Factors, Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278, 281 (2d Cir.1981) ("noting that tort conflicts rules apply to issue of conversion of property, but property conflicts rules apply to whether plaintiff has title to property allegedly converted"). Appellants' assertion that their rights derive from implied consent and trade custom invokes Contract principles as well.

If Massachusetts still adhered to the single-factor mode of analysis of the First Restatement, categorizing this action would be critical.

Massachusetts' first decisive step toward a modern approach to choice of law was its decision in *Pevoski v. Pevoski*, 371 Mass. 358, 358 N.E.2d 416 (1976), a tort action in which the Supreme Judicial Court rejected a single-factor, *lex locus delicti* test. The court stated, "[w]e agree with the conflicts approach suggested by" *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S. 743, 191 N.E.2d 279 (1963), a case which explicitly weighed the policy interests underlying laws of the various states whose citizens were involved. *Pevoski*, 371 Mass. at 361, 358 N.E.2d at 418. In *Choate, Hall & Stewart, supra*, the Supreme Judicial Court amplified its commitment to such an analysis, even though the outcome of the contract action before the court did not depend upon application of an interest analysis. The court noted:

> [A]lmost all States have replaced place-of-making or other one-factor tests with a more functional approach. See *Breslin v. Liberty Mut. Ins. Co.*, 134 N.J.Super. 357, 341 A.2d 342 (1975) ("interest" analysis); Restatement (Second) of Conflict of Laws § 188 (1971) ("most significant relationship"); R. Leflar, American Conflicts Law § 150 (3d ed. 1977). Similar ideas have been at work in our recent decisions transforming the rule about applying to a tort the law of the place of the happening.

*Choate, Hall & Stewart*, 378 Mass. at 541, 392 N.E.2d at 1049.

◼ Most recently, in *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622,

473 N.E.2d 662 (1985), responding to questions we certified, the Supreme Judicial Court reaffirmed its adherence to the "more functional approach" of *Choate, Hall & Stewart*. Declining to "tie Massachusetts conflicts law to any specific choice-of-law doctrine", *Bushkin*, at 668, the court made clear that the relevant factors for consideration are those set forth in the *Restatement (Second) of Conflict of Laws* § 6(2), and in *R.A. Leflar, American Conflicts Law* (3d ed. 1977). We are, therefore, satisfied that they would reach the same result as we do.[3]

## III.

◼ In light of Massachusetts' adoption of modern choice of law rules, we reject at the outset defendants' contention that a court need only consider the domicile of the person whose name or likeness is being exploited to determine the law governing this action. To focus solely on that domicile would disregard the development of Massachusetts law which now calls for the "more functional approach" set forth in *Bushkin, supra*. Under such an approach, domicile is significant only to the extent that it implicates interests that are cognizable under an "interest" or "most significant relationship" analysis.[4]

The Second Restatement of Conflict of Laws, section 6(2) sets forth the perimeters for the kind of analysis the Massachusetts courts would employ:

C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 4248 (1978).

---

Indeed, the parties' briefs are largely dedicated to asserting that one categorization or another is appropriate. However, Massachusetts' choice of law rules no longer rest on such a rigid system. Massachusetts' current approach is based on a set of overarching principles and considerations applicable to all choice of law questions. *Cf. Restatement (Second) of Conflict of Laws* § 6(2), *infra* part III.

3. Although Massachusetts allows certification of difficult questions of state law to the Supreme Judicial Court, it is inappropriate for a federal court to use such a procedure when the course state courts would take is reasonably clear. *See Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 274–75 (5th Cir.1976), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976); *see also*

4. Some choice of law decisions involving the right of publicity mention the domicile of the person whose name or likeness is being used commercially as part of a "contacts" analysis of the choice of law question. *See, e.g., Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 281 (2d Cir.1981); *Groucho Marx Productions v. Day and Night Co.*, 689 F.2d 317, 320 (2d Cir.1982); *Bi-Rite Enterprises, Inc. v. Button Master*, 555 F.Supp. 1188, 1196 (S.D.N.Y.1983). But in most cases this mention is merely cumulative; performers' domiciles generally coincide with the places where they exploit their rights. *See, e.g., Button Master*, 555 F.Supp. at 1197.

(2) When there is no [contrary statutory] directive, the factors relevant to the choice of applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Restatement (Second) Conflicts of Laws* (1971), *quoted in Bushkin, supra*, at 669.

We begin our choice of law analysis with the first of the factors listed in section 6(2) of the Second Restatement—here, the needs of the international system. In the popular music industry, trade between Great Britain and the United States is pervasive and much prized. It is nurtured in part by the policy in both countries of affording the same commercial rights to foreigners as to nationals. Moreover, it might very well be unconstitutional for an American jurisdiction to extend lesser contractual rights to foreign performers in this country than to their American counterparts. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

Defendants urge that the law of Great Britain should be applied to the American merchandising activities of British performers. To do so would extend lesser commercial rights to British than to American performers. A British performer could not enter into an exclusive licensing agreement with an American merchandiser while an American performer could. Such a result cannot be squared with the needs of the international system in this area.

■ Turning next to the relevant policies of the forum, it is clear that Massachusetts recognizes a right of publicity. Mass.Gen.

Laws ch. 214, § 3A; *see also Tropeano v. Atlantic Monthly Co.*, 379 Mass. 745, 400 N.E.2d 847 (1980). However, since none of the plaintiffs is domiciled there, Massachusetts courts, in the interest of comity, would look to the laws of other jurisdictions to determine whether plaintiffs can validly claim a right of publicity. This calls for determining the jurisdictional law which Massachusetts would apply.

Making that determination calls, in turn, for consideration of the policy interests underlying the relevant rules of Illinois, Connecticut, Georgia and Great Britain—i.e. the four jurisdictions involved in this case.

Although Illinois, Connecticut and Georgia may differ in the extent to which they recognize a "right of publicity," they can be considered together for purposes of choice of law. They share the basic policy interests underlying the right of publicity as recognized in most American jurisdictions:

"The rationale for [protecting the right of publicity] is the straight-forward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." Kalven, Privacy in Tort Law—Were Warren and Brandeis Wrong?, 31 Law & Contemp. Prob. 326, 331 (1966).

\* \* \* \* \* \*

Of course, [the] right of publicity here rests on more than a desire to compensate the performer for the time and effort invested in his act; the protection provides an economic incentive for him to make the investment required to produce a performance of interest to the public. This same consideration underlies the patent and copyright laws long enforced by this Court.

*Zacchini v. Scripps-Howard Broadcasting*, 433 U.S. 562, 576, 97 S.Ct. 2849, 2857, 53 L.Ed.2d 965 (1977) (discussing Ohio law).

It is more difficult to ascertain the policy interests underlying Britain's refusal to

recognize a right of publicity. Indeed, in the very case confirming that refusal, the wisdom of the rule was challenged by Lord Greer:

> I have no hesitation in saying that in my judgment the defendants in publishing the advertisement in question, without first obtaining Mr. Tolley's consent, acted in a manner inconsistent with the decencies of life, and in doing so they were guilty of an act for which there ought to be a legal remedy.

*Tolley v. Fry*, 1 K.B. 467, 478 (1930), *supra*.

Even though the policy interests underlying the British rule have not been fully articulated, the British refusal to recognize a right of publicity should be taken into account. In the area of publicity rights, as in the areas of trademark, patent, and copyright, the law must balance the competing goals, on the one hand, of facilitating public access to valuable images, inventions and ideas and, on the other, rewarding individual effort. In American law there are some areas in which the public interest is thought to be served best by allowing unrestricted competitive commerce in images and information. *See, e.g., Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (fashion design). For purposes of choice of law analysis, it must be assumed that Britain's refusal to recognize a right of publicity represents a policy choice favoring unrestricted competition in the area of commercial exploitation of names and likenesses.

Even so, the differing policy choices behind American and British law do not necessarily call for application of British law in the present case. Recognizing American publicity rights for British performers does not restrict free commerce in Britain. That is to say, Britain's presumed interest in allowing its citizens unrestricted access to the names and likenesses of performers is not disserved by allowing those performers to restrict the merchandising of their names and likenesses in the United States. Nor does it follow that because Britain has

not seen fit to provide direct economic incentives for performers to market their public images in England, there need be any proscription of allowing those performers such incentives in the United States. The British public is not harmed if the laws of the United States aggrandize British performers.

The next consideration listed in section 6(2) of the Second Restatement, protecting justifiable expectations, is somewhat problematic. On the one hand, American merchandisers justifiably expect that the performers with whom they have entered into exclusive merchandising contracts have the right to license their publicity rights. On the other hand, defendants argue that the posters they sell are in fact authorized wares because they come from publicity photographs which the photographers sell to the European manufacturers of the posters. Under British law, photographers and their assignees enjoy copyright protection and justifiably expect to possess a broad range of rights with respect to the photographs. Defendants' argument merits some discussion.

Defendants claim that the posters they sell are made from publicity photographs taken at British "photosessions." According to defendants, these photosessions are customary in the British popular music industry. The photographers distribute the resultant photographs through syndicating agencies to newspapers, to magazines, and occasionally to poster manufacturers. While some photosessions are conducted on an express understanding that resulting pictures may only be used for specific purposes, such as newspaper publication, others, so-called "unrestricted photosessions", are conducted without any discussion of limitations. Thus, defendants claim, performers who agree to pose at unrestricted photosessions do so with the understanding that the photographers may use the resultant photographs however they choose.

The claim is too broad. To be sure, British performers who participate in unrestricted photosessions know or may reasonably be charged with knowledge, that, un-

der British law, they retain no publicity rights in Great Britain. But nothing in the record justifies an assumption that any performers in this case intended to convey *American* publicity rights to the photographers. The relevant British law speaks only to uses in Great Britain. It does not purport to speak to uses in other nations.

 In the case at bar, the law of the United States governs. It has long been established here, as the district court noted, that "[b]y authorizing photographs, a performer does not, without more, license their commercial exploitation." *See Ali v. Playgirl, Inc.*, 447 F.Supp. 723, 727 (S.D.N.Y.1978); *Eick v. Perk Dog Food Co.*, 347 Ill.App. 293, 106 N.E.2d 742 (1952) (and cases therein); *see also Ettore v. Philco Television Broadcasting Corp.*, 229 F.2d 481, *cert. denied*, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956). The automatic legal consequences of posing for photographs in Britain cannot be construed to constitute a contractual undertaking with respect to American publicity rights.

The final considerations listed in section 6(2) of the Second Restatement are "certainty, predictability, and uniformity of result, and ease in the determination and application of the law to be applied." With respect to these considerations, the better decision is obvious. Any rule basing publicity rights on the nationality of the performer would give rise to unnecessary confusion. To require American producers and merchandisers of novelties to tailor their expectations and actions according to the nationality of the individuals depicted would be anomalous and unworkable. Such a rule would also create tremendous uncertainty for foreign performers, such as the individual plaintiffs, who seek to do business in this country.

## V.

In light of the foregoing considerations, we conclude that the district court correctly decided that, for Bi-Rite's claims, the law of Illinois governs, for those of Artemis, the law of Connecticut, and for those of the individual plaintiffs, the law of Georgia.

The judgment of the district court is AFFIRMED.