**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MIKE LOVE,
          *Plaintiff-Appellant,*

          v.

SANCTUARY RECORDS GROUP, LTD.;
SANCTUARY RECORDS GROUP INC.;
SANCTUARY ARTIST MANAGEMENT,
INC.; SANCTUARY MUSIC
PRODUCTIONS, INC.; BIGTIME.TV;
MELINDA WILSON; SOOP LLC;
DAVID LEAF,
          *Defendants-Appellees.*

No. 07-56008

D.C. No.
CV-05-07798-ABC

MIKE LOVE,
          *Plaintiff-Appellant,*

          v.

SANCTUARY RECORDS GROUP, LTD.;
SANCTUARY RECORDS GROUP INC.;
SANCTUARY ARTIST MANAGEMENT,
INC.; SANCTUARY MUSIC
PRODUCTIONS, INC.; SOOP LLC;
DAVID LEAF,
          *Defendants-Appellees.*

No. 07-56568

D.C. No.
CV-05-07798-ABC

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, Chief District Judge, Presiding

Argued and Submitted
February 10, 2010—Pasadena, California

9771

Filed July 8, 2010

Before: Sidney R. Thomas and Barry G. Silverman,
Circuit Judges, and Jeremy D. Fogel,* District Judge.

Opinion by Judge Thomas

*The Honorable Jeremy D. Fogel, United States District Judge for the
Northern District of California, sitting by designation.

## COUNSEL

Philip H. Stillman, Stillman and Associates, Cardiff, California, for plaintiff-appellant Mike Love.

Barry E. Mallen, Manatt, Phelps & Phillips, LLP, Los Angeles, California; Howard L. Weitzman, Kinsella Weitzman Iser Kump & Aldisert LLP, Santa Monica, California, for defendants-appellees Sanctuary Records Group, Ltd., Sanctuary Records Group, Inc., Sanctuary Artist Management, Inc., and Sanctuary Music Productions, Inc.

Neville L. Johnson, Johnson & Johnson LLP, Beverly Hills, California, for defendant-appellee BigTime.tv.

## OPINION

THOMAS, Circuit Judge:

This appeal presents the question, *inter alia*, of whether the Lanham Act and California's common law right of publicity apply extra-territorially to events occurring in Great Britain. Under the circumstances presented by this case, we conclude that such claims are not viable, and we affirm the judgments entered by the district court.

I

In 2004, founding Beach Boy member Brian Wilson, who had written (or co-written) most of the iconic Beach Boy hits, released a solo album called *Smile*. Wilson mounted a tour, with backup band, to support the album. It had been years since Brian Wilson had toured regularly with The Beach Boys. As part of settlement of earlier litigation, Mike Love, also a founding member of The Beach Boys, had acquired the right to use The Beach Boys trademark in live performances. He continued to tour as The Beach Boys with a varying lineup, playing hundreds of shows a year.

As part of a promotion campaign, the British newspaper the *Mail on Sunday* distributed a compact disc, consisting of Brian Wilson's solo versions of Beach Boy songs, along with of his solo work, with approximately 2.6 million copies of the paper. The CDs were distributed in the United Kingdom and Ireland. Approximately 425 copies of that edition of the *Mail* were distributed in the United States without the CD, including 18 in California.

The cover of the distributed compact disc, entitled *Good Vibrations*, featured Brian Wilson, along with three smaller photographs of The Beach Boys. The small photographs of the group included a picture of Mike Love. The front page of the *Mail on Sunday* advertised the CD prominently, and

included an image of the CD's cover. In addition to sound recordings, the CD contained two videos of live performances by Wilson's band.

Love was concerned that a second British invasion and Wilson's return to touring and recording would dampen ticket sales for the live performances of his touring group. Thus, in response to the English promotion, Love sued a variety of parties for their involvement in the promotion campaign. He sued Wilson; Associated Newspapers Limited ("ANL"), the publisher of *Mail on Sunday*; BigTime.tv, a British company that licensed and recorded the compact disc; Sanctuary Records Group, Ltd., the entity that owned the rights to the Brian Wilson recordings relevant to this case, as well as Sanctuary Records Group NY, Sanctuary Music Management, Inc., and Sanctuary Music Productions, Inc. ("the Sanctuary defendants"); Jean Sievers, the Lippin Group, Inc., and SOOP LCC, Wilson's managers and publicist; David Leaf, a writer and producer for Wilson; and Melinda Wilson, Wilson's wife.

The district court dismissed the complaint against Big-Time.tv and ANL for lack of personal jurisdiction, and awarded sanctions to BigTime.tv. It dismissed with prejudice three of the Sanctuary defendants (Sanctuary Records Group NY, Sanctuary Music Management, Inc., and Sanctuary Music Productions, Inc.) on the basis of their unopposed motion asserting that they had nothing whatsoever to do with the case. The court dismissed Melinda Wilson from the suit with prejudice, as Love had not been given permission to add her as a defendant, and because the complaint alleged no facts that would support keeping her in the lawsuit.

The district court dismissed the claims for violation of California's statutory and common law rights of publicity after holding that English law, which does not recognize a right of publicity, governed. It dismissed three Lanham Act claims, two for lack of standing, and one after finding that the extra-territorial reach of the statute did not encompass the claims.

The district court also dismissed four claims raised only against Wilson, four claims against various defendants for interference with contractual relations and prospective economic advantage, and three copyright claims. Because Love's claim of violation of California fair business practices law depended on the survival of the Lanham Act claims, and because his civil conspiracy allegation depended on the survival of at least one other claim, and that Love had failed to allege acts that would constitute conspiracy, the district court dismissed those two claims as well.

Over the course of the proceedings, Love filed three complaints. In his first amended complaint, he alleged that he was domiciled in Nevada. In his second amended complaint, he removed that line, and claimed to be "an individual with a residence in California." The district court "**strongly admonishe[d]**" Love for alleging to have a residence in California and, based on this "legal nullity," claiming in papers that "Love is a California resident." (emphasis in original).

Love responded to criticism by the district court that he had failed to introduce any evidence that *Good Vibrations* had ever entered the U.S. market by filing a declaration by Steven Surrey that Surrey had bought a copy of *Good Vibrations* on eBay because he thought it was an official Beach Boys product ("Surrey affidavit"). Because of uncontested evidence that Surrey was a close associate of Love's attorney and had fabricated his allegation that he was confused by the labeling of *Good Vibrations*, the district court never considered the Surrey affidavit to have any evidentiary value, and entered sanctions against Love's counsel.

In response to some confusion as to whether and when a final and appealable judgment had been issued, the district court entered a stipulated final judgment on June 1, 2007. Love timely filed a notice of appeal on July 2, 2007. On September 7, 2007, the district court granted the motions for attorney's fees filed by eight defendants, including the Sanc-

tuary defendants. Love appealed the attorney's fees award on October 17, 2007. The two appeals have been consolidated.

After reaching settlement with many of the defendants in this case,[1] Love continues to appeal the following issues: dismissal of BigTime.tv; dismissal of the right of publicity claims; dismissal of the conspiracy claim; dismissal of the three Lanham Act claims and the related California unfair business practices claim; and the award of attorney's fees to the Sanctuary defendants.[2]

The central issue before us is whether American claims for relief can be asserted on the basis of conduct that only occurred in Great Britain. The defendants think not. Love wishes they all could be California torts.

## II

The district court dismissed BigTime.tv from the suit for lack of personal jurisdiction, a decision we review de novo. *Schwarzenegger v. Fred Marin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). The plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *Id.* Where, as here, a motion to dismiss is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. *Id.* Uncontroverted allegations in the complaint must be taken as true, and conflicts over statements contained in affidavits must be resolved in the Love's favor. *Id.*

---

[1]Love has now settled with Wilson, ANL, Jean Sievers, and the Lippin Group, who have already been dismissed from this appeal, and SOOP LLC and David Leaf, whom we now dismiss as well.

[2]Because Love has not argued that dismissal of Melinda Wilson, Sanctuary Records Group NY, Sanctuary Music Management, Inc., or Sanctuary Music Productions, Inc. was in error, we affirm those dismissals without further comment.

**[1]** Where there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which it sits. *Yahoo! v. La Ligue Contre le Racisme*, 433 F.3d 1199, 1205 (9th Cir. 2006) (en banc).[3] California's long-arm jurisdictional statute is coextensive with federal due process requirements. *Id.*; Cal. Code Civ. Pro. § 410.10. Thus, the district court was permitted to exercise personal jurisdiction over BigTime.tv only if BigTime.tv had "certain minimum contacts" with California "such that the maintenance of the suit d[id] not offend the traditional notions of fair play and substantial justice." *Yahoo!*, 433 F.3d at 1205 (internal quotation marks omitted).

The parties agree that we should use the "purposeful direction" or "effects" test in this case. The effects test is satisfied if (1) the defendant committed an intentional act; (2) the act was expressly aimed at the forum state; and (3) the act caused harm that the defendant knew was likely to be suffered in the forum state. *Id.* at 1206. Where a defendant's "express aim was local," the fact that it caused harm to the plaintiff in the forum state, even if the defendant knew that the plaintiff lived in the forum state, is insufficient to satisfy the effects test. *Schwarzenegger*, 374 F.3d at 807.

**[2]** Here, BigTime.tv did contact people in California regarding the promotion that would eventually lead to this law suit. However, those discussions did not enable or contribute to the promotion activities that actually gave rise to the law suit. The intentional acts that allegedly harmed Love—including BigTime.tv's licensing of the recordings and promotion of *Good Vibrations* on television and the internet—were directed entirely at markets in the United Kingdom and Ireland, and Love does not argue differently.[4] *See Sinatra v.*

---

[3]A majority of the en banc court concurred in Part II of Judge W. Fletcher's opinion, regarding personal jurisdiction. Citations are to that part of the opinion.

[4]Love also argues that harm directed at him was necessarily aimed at California, since his musical career is based in California, and BigTime.tv

*Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1193 (9th Cir. 1988) (finding jurisdiction because "the misappropriation of Sinatra's name" was "one component of a series of ongoing efforts by the defendant to avail itself of the benefits of the California market").

**[3]** Because BigTime.tv did not purposefully direct any of the relevant intentional acts at California, it was not subject to the jurisdiction of a court in that state.

## III

The district court correctly dismissed Love's right of publicity claims using a choice of law analysis, an analysis we review de novo. *APL Co. Pte. Ltd. v. UK Aerosols Ltd.*, 582 F.3d 947, 955 (9th Cir. 2009). We also review the district court's interpretation of state law de novo. *Evanston Ins. Co. v. OEA, Inc.,* 566 F.3d 915, 920 (9th Cir. 2009). We apply the clearly erroneous standard to factual findings that underlie the

was aware of that when it purposefully interfered with his commercial interests. Since this case was argued, we have held that the "expressly aimed" prong of the purposeful direction test can be met where a plaintiff alleges that the defendant individually targeted him by misusing his intellectual property on the defendant's website for the purpose of competing with the plaintiff in the forum. *See Brayton Purcell, LLP v. Recordon & Recordon*, ___ F.3d ___, 2010 WL 2135302, at * 4 (9th Cir. 2010). In *Brayton*, in contrast to here, the plaintiff (a Southern California law firm) actually alleged facts that, if proven, would show that the defendant (a Northern California law firm) intentionally targeted the plaintiff's business where the plaintiff firm was located. *Id.* We merely held that the defendant's "conclusory denial" that its actions were not aimed at prospective clients in Northern California did "not rebut" the plaintiff's fact-based allegation to the contrary. *Id.* Here, Love's argument that BigTime.tv targeted his business interests in California is not supported by facts. Even if BigTime's alleged misuse of Love's persona and intellectual property was expressly aimed at Love—and such a claim is significantly less supported than the plaintiff's parallel claim in *Brayton*—Love is a citizen not of California but of Nevada.

choice of law determination. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001).

**[4]** Federal courts must apply state substantive law to state law claims, including the forum state's choice of law rules. *Id.* at 1005. California applies the "governmental interest" approach to conflicts issues, including those involving right of publicity claims. *Id.* Under this approach,

> (1) the court examines the substantive laws of each jurisdiction to determine whether the laws differ as applied to the relevant transaction, (2) if the laws do differ, the court must determine whether a true conflict exists in that each of the relevant jurisdictions has an interest in having its law applied, and (3) if more than one jurisdiction has a legitimate interest . . . the court [must] identify and apply the law of the [jurisdiction] whose interest would be more impaired if its law were not applied. Only if both [jurisdictions] have a legitimate but conflicting interest in applying its own law will the court be confronted with a "true conflict" case.

*Id.* (internal quotation marks and citations omitted) (omission and first alteration in original).

A

**[5]** Although California recognizes both a statutory and common law right of publicity, and England recognizes neither, this is not a case of true conflict. *See Bi-Rite Enters., Inc. v. Bruce Miner Co., Inc.*, 757 F.2d 440, 442 (1st Cir. 1985) (citing *Tolley v. Fry*, 1 K.B. 467 (1930)); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 408 (2001). California has no interest in applying its law to the conduct in question. None of the parties remaining in this suit is a citizen of California. The misappropriation in this suit occurred almost exclusively in the United Kingdom and Ireland, where mil-

lions of copies of the *Mail on Sunday* and *Good Vibrations* were distributed. *See Downing*, 265 F.3d at 1006 (explaining that "any misappropriation of the names and likenesses" of Hawaiian surfers occurred in California, where the catalogue containing their photos was distributed). At most, de minimus conduct occurred in California when a handful of copies of the paper were delivered without the CD, and a handful of copies of *Good Vibrations* were sent to Wilson's attorney in California.

Love asserts that he is not an out-of-state plaintiff because he owns property in California and has other commercial interests there. California's right of publicity "permit[s] celebrities . . . to control the commercial exploitation of the celebrity's likeness." *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 805 (Cal. 2001); *see also Lugosi v. Universal Pictures*, 603 P.2d 425, 445 (Cal. 1979) (Bird, C.J., dissenting) ("The right of publicity protects the intangible proprietary interest in the commercial value in one's identity."). California's interest in applying the right of publicity extraterritorially is based on its interest "safeguarding its citizens from the diminution in value of their names and likenesses." *Sinatra*, 854 F.2d at 1202. *Cf. Brand v. Menlove Dodge*, 796 F.2d 1070, 1075 (9th Cir. 1986) ("[S]tates have a strong interest in protecting their *own* citizens . . . ."). Love cites no case where California has recognized that injury relevant to a choice-of-law analysis is suffered anywhere other than the domicile of the celebrity or the location where the image is exploited.[5]

### B

Even if Love's commercial interests in California did create

---

[5]Love's California "residence," by which we assume Love means "a building used as a home," *Merriam Webster's Collegiate Dictionary* 996 (10th ed. 1996), has nothing to do with this case and therefore is irrelevant to our choice-of-law analysis.

a true conflict, England's interests would be much more greatly impaired by a failure to apply English law.

**[6]** "In making [its] comparative impairment analysis, the trial court must determine the relative commitment of the respective states to the laws involved and consider the history and current status of the states' laws and the function and purpose of those laws." *Wash. Mutual Bank, FA v. Super. Ct.*, 15 P.3d 1071, 1081 (Cal. 2001) (internal quotation marks omitted). "[O]ne of the goals of that analysis is the maximum attainment of underlying purpose by *all* governmental entities." *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 918 (Cal. 2006) (internal quotation marks omitted).

**[7]** Although England does not recognize a right of publicity, it does provide celebrities with certain other limited protections against commercial misappropriation, including copyright, trademark, and the tort of "passing off." Alain J. Lapter, *How the Other Half Lives (Revisited): Twenty years since* Midler v. Ford — *A global perspective on the right of publicity*, 15 Tex. Intell. Prop. L.J. 239, 278-83 (2007). *See generally*, Julie King, *The Protection of Personality Rights for Athletes and Entertainers under English Intellectual Property Law: Practical difficulties in relying on an action of passing off*, 7 Sports Law. J. 351 (2000). Additionally, while England does not recognize a right to privacy as such, it does provide stronger protections against defamation than the United States. *See* J. Thomas McCarthy, 1 Rights of Publicity and Privacy § 6:155 (2d ed) (explaining that England has never recognized a right to privacy); Raymond W. Beauchamp, Note, *England's Chilling Forecast: The case for granting declaratory relief to prevent English defamation actions from chilling American speech*, 74 Fordham L. Rev. 3073, 3077-91 (2006) (comparing American and English defamation law). Thus, we agree with the First Circuit that England has manifested "a policy choice favoring unrestricted competition in the area of commercial exploitation of names and likenesses." *Bi-Rite*, 757 F.2d at 445; *see also id.* ("In the area of publicity

rights, as in the areas of trademark, patent, and copyright, the law must balance the competing goals, on the one hand, of facilitating public access to valuable images, inventions and ideas and, on the other, rewarding individual effort.").

**[8]** Even if California has an interest in protecting the right of an entertainer with economic ties to the state to exploit his image overseas, that interest is not nearly as significant as England's interest in (not) regulating the distribution of millions of copies of a newspaper and millions of compact discs by a British paper primarily in the United Kingdom.

C

**[9]** Love argues that the Uniform Single Publication Act ("USPA") displaces the traditional choice-of-law analysis in media cases. As the California Supreme Court has explained,

> [t]he single-publication rule was created to address the problem that arose with the advent of mass communication from the general rule in defamation cases that "each time the defamatory statement is communicated to a third person . . . the statement is said to have been 'published,'" giving rise to a separate cause of action.

*Christoff v. Nestle USA, Inc.*, 213 P.3d 132, 137-38 (Cal. 2009) (quoting *Shively v. Bozanich*, 80 P.3d 676, 683 (Cal. 2003)) (omission in *Christoff*). The USPA "advances the universal interest in avoiding a multiplicity of suits and assisting the orderly administration of justice" *Motschenbacher v. R. J. Reynolds Tobacco Co.*, 498 F.2d 821, 823 n.4 (9th Cir. 1974). But it does not displace the governmental interest test or have any other application to the conflict of laws question at issue in this case. *See Hartmann v. Time, Inc.*, 166 F.2d 127, 134-35 (3d Cir. 1948); *Givens v. Quinn*, 877 F. Supp. 485, 488 (W.D. Mo. 1994) ("The single publication rule is not a

choice-of-law rule.”). Therefore, it has no application in the present context.

## IV

The district court correctly dismissed Love's Lanham Act claims. Under the circumstances presented here, we conclude that the Lanham Act cannot be applied extraterritorially to encompass acts committed in Great Britian.

As we have noted, Love has the limited exclusive right to use The Beach Boys trademark in live performances. Love has alleged that the use of the mark "The Beach Boys" on and to promote *Good Vibrations*, in conjunction with the inclusion of video recordings of live performances on the disc, infringed upon and diluted his interests in the trademark, and competed with his live band unfairly. Sanctuary argues that because the creation, promotion, and distribution of *Good Vibrations* all occurred in Europe, the Lanham Act does not apply in this case. We agree with Sanctuary.

**[10]** We analyze the Lanham Act's coverage of foreign activities under a three-part test originally developed in the antitrust context.[6] *See Star-Kist Foods, Inc. v. P.J. Rhodes &*

---

[6]Recently, while refining the rules regarding the extraterritorial application of federal statutes, the Supreme Court explained that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Australia Bank Ltd.*, __ S.Ct. __, 2010 WL 2518523, at *5. The Court was unable to find a clear indication in the Securities Exchange Act, and therefore limited the reach of § 10(b) to the purchase or sale of a security listed on an American stock exchange, or the purchase or sale of any other security in the United States. *Id.* at * 14.

As we explained in *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406 (9th Cir. 1977), when we adopted the test for extraterritorial application of the Lanham Act, "[t]he Lanham Act grants a civil right of action against '[a]ny person who shall . . . use in commerce,' in any improper manner detailed therein, a registered trademark"; and, "[f]or purposes of the Act, 'commerce' is sweepingly defined as 'all commerce

Co., 769 F.2d 1393, 1395 (9th Cir. 1985) (citing *Timberlane Lumber Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 549 F.2d 597 (9th Cir. 1976), *superceded by statute*, 15 U.S.C. § 6a). For the Lanham Act to apply extraterritorially: (1) the alleged violations must create some effect on American foreign commerce; (2) the effect must be sufficiently great to present a cognizable injury to the plaintiffs under the Lanham Act; and (3) the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority. *Id.*

The first two criteria may be met even where all of the challenged transactions occurred abroad, and where "injury would seem to be limited to the deception of consumers" abroad, as long as "there is monetary injury in the United States" to an American plaintiff. *See Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 503 (9th Cir. 1991)*; see also Reebok Intern'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 554-55 (9th Cir. 1992) (the first two criterion were met where a defendant was found to have "organized and directed [the deception] from the United States" and to have known that the deceptive product "went back to the United States with regular frequency" and that sales of the "genuine" product decreased in the United States).

**[11]** Here, it is undisputed that all relevant acts occurred abroad. The idea for the CD originated with Ian Spero of Big-Time.tv, who then approached ANL. BigTime.tv and ANL are both British entities. The CDs were physically manufac-

---

which may lawfully be regulated by Congress.' " *Id.* at 426 (quoting 15 U.S.C. §§ 1114(a)(1), 1127). Because this sweeping language contrasts so readily with the language in the Securities Exchange Act, not merely referring to foreign commerce but expressly covering all commerce Congress can regulate, *see Morrison*, 2010 WL 2518523, at * 9-* 11, we see no need to revisit our case law regarding the extraterritorial application of the Lanham Act.

tured by Optical Disc Services Limited, a company in Germany with offices in London. Love no longer claims that the CDs were distributed in the United States, and in fact Sanctuary never sold or distributed any copies of the CD to anyone at all. The only CDs shown to have entered the United States never reached the market, as Wilson's attorney kept the CDs in his office until this litigation commenced.[7] Although Big-Time.tv did discuss the album with Wilson's attorney in California, it ignored the attorney's advice not to use the images of anyone other than Wilson, or at least to secure the permission of any other Beach Boy whose image would be used.

Therefore, for the Lanham Act to apply, Love must have presented evidence that the complained of actions caused him monetary injury in the United States. Love' declaration—that his ticket sales in the United States were lower after the distribution of *Good Vibrations*, the release of *Smile*, and the U.S. tour embarked upon by Wilson—is insufficient. Even if, as Love argues, European purchasers of the *Mail of Sunday* would mistakenly associate the promotional CD with Love, *Smile*, and the official Beach Boys touring band, it is too great of a stretch to ask us, or a jury, to believe that such confusion overseas resulted in the decreased ticket sales in the United States.

**[12]** Because Love failed to present any evidence that the alleged Lanham Act violations affected United States commerce in any way, we affirm dismissal of all three claims on that ground.[8] Love does not challenge the district court's

---

[7]The district court acted well within its discretion determining that the Surrey affidavit was "an attempt to manufacture a genuine issue of fact where none exists" and thus according it no weight. *Cf. Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991) (permitting a district court to discount a declaration in an affidavit that contradicts prior deposition testimony if it "make[s] a factual determination that the contradiction was actually a 'sham' ").

[8]Love also argues that the district court abused its discretion granting summary judgment in the face of requests for additional discovery. Love

determination that his state law unfair competition claim and his state law conspiracy claim could not survive if the Lanham Act and publicity claims failed, and so we affirm dismissal of those claims as well.

V

The district court awarded the Sanctuary defendants attorney's fees with respect to all of the claims stated against them. We review an award of attorney's fees for abuse of discretion, factual findings for clear error, and legal conclusions de novo. *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1207 (9th Cir. 2009).

Attorney's fees are awardable where there is an applicable attorney's fees provision in a contract, if "there is express statutory authorization," or for work done on claims that "involve a common core of facts or [are] based on related legal theories" as the claims governed by statutory or contractual attorney's fees provisions, such that the "lawsuit cannot be viewed as a series of discrete claims." *See Hensley v. Eckerhart*, 461 U.S. 424, 429, 435 (1983).

The district court determined that "for nearly every claim, there is a statutory or contractual basis for awarding [the Sanctuary defendants] fees." Where no independent basis existed to support an award, the district court found the claims "inextricably intertwined with claims" that had such a support. We agree.[9]

describes in detail the discovery that he wished to pursue, none of which relates to whether or not the alleged violations impacted U.S. foreign commerce or injured Love in any way. Because this "discovery would [have been] 'fruitless' with respect to the proof of a viable claim," the district court did not abuse its discretion. *See Jones v. Blanas*, 393 F.3d 918, 930 (9th Cir. 2004).

[9]Love does not argue that the Sanctuary defendants were not prevailing parties, nor does he challenge the actual amounts awarded under the district court's lodestar analysis.

A

**[13]** California's right of publicity statute mandates an award of attorney's fees for "[t]he prevailing party in any action under this section." Cal. Civ. Code § 3344; *Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 62 (2006). Love argues that the statute cannot support an attorney's fees award if, under our choice-of-law analysis, the statutory provision did not apply to the claim.[10]

**[14]** Since Love brought an action *under* California's right of publicity statute, however, section 3344 clearly mandates an award of attorney's fees, notwithstanding the fact that the action failed because the statute's substantive law does not govern Love's claim. *Cf. Cairns v. Franklin Mint. Co.*, 292 F.3d 1139, 1149, 1156 (9th Cir. 2002) (awarding attorney's fees under comparable posthumous right of publicity statute where plaintiff alleged claim under statute but law of Great Britain actually governed the claim).

B

**[15]** Under the Copyright Act of 1976, a district court has the discretion to award "a reasonable attorneys' fee to the prevailing party." 17 U.S.C. § 505. In considering whether to exercise that discretion, the court might consider (1) the degree of success obtained; (2) frivolousness; (3) motivation; (4) the objective unreasonableness of the losing party's factual and legal arguments; and (5) the need, in particular circumstances, to advance considerations of compensation and deterrence. *Jackson v. Axton*, 25 F.3d 884, 890 (9th Cir. 1994)

---

[10]Because Love's statutory and common law claims were premised on the same facts and dismissed on the same basis, the district court determined that the claims were "inextricably intertwined." Love does not challenge this conclusion.

(citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).[11]

The district court awarded attorney's fees after finding that the copyright claims "bordered on frivolous and were not objectively reasonable" and that they "contributed to the bloat" of a "vastly overpled . . . case." The district court saw Love's theory of the case to be fatally flawed from the outset. First, he did not hold the copyrights at issue, but was merely a beneficial owner. Second, Love was attempting to hold the Sanctuary defendants liable for somehow authorizing Rondor, the legal copyright owner to the compositions and not a party to the case, to license ANL to use of the compositions on the CD at covermount prices when *Good Vibrations* was not technically a covermount CD.[12]

Love argues that the district court abused its discretion because (1) the district court's finding that Love, as a beneficial owner, had standing to bring his claims, means that they could not be objectively unreasonable and (2) he presented evidence before the attorney's fees were granted that the covermount license was invalid.

**[16]** The mere fact that a plaintiff has statutory standing

---

[11]We note that, contrary to the statements of several circuits, including our own, *Jackson* was not overruled by the previously-decided *Fogerty*. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 833 n.2 (9th Cir. 2002) (mistakenly stating that *Jackson* was abrogated by *Fogerty*). *See also Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 232 (6th Cir. 2007) (same); *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1101 (9th Cir. 2004) (same); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 951 (10th Cir. 2002) (same). Rather, *Jackson* specifically cites *Fogerty* as overruling a *different* Ninth Circuit case, *Cooling Sys. & Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485 (9th Cir. 1985).

[12]Sanctuary licensed ANL to use the Wilson recordings, but ANL obtained permission to use the compositions directly from the holder of those copyrights.

does not make his legal and factual arguments objectively reasonable. Love did not plead any facts that would somehow connect the Sanctuary defendants to Rondor and ANL's allegedly invalid licensing agreement, and in fact three of the Sanctuary defendants were dismissed from the case entirely, based on their uncontested assertion that they had nothing whatsoever to do with the promotion. The district court did not abuse its discretion awarding these attorney's fees.

C

**[17]** The Lanham Act allows for an award of attorney's fees in "exceptional cases." 15 U.S.C. § 1117(a). "[I]nterpretation of what constitutes an 'exceptional case' is a question of law [that] we review . . . de novo." *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003). "Where a trademark case is exceptional, we review a district court's decision to award attorney's fees for an abuse of discretion." *Id.*

**[18]** "A trademark case is exceptional where the district court finds that the defendant acted maliciously, fraudulently, deliberately, or willfully." *Id.*; *see also Stephen W. Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 827 (9th Cir. 1997) (citing an Eighth Circuit case that held that "[w]hen a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith, it is exceptional").

Here, the district court awarded fees in part because Love "presented not one item of evidence substantiating any U.S. effect," other than a "misleading and deceptive declaration," and that any case cited by Love to support his extraterritorial application argument was "readily distinguishable and of no persuasive value." The district court found that the Surrey affidavit "unreasonably and vexatiously . . . lengthened or multiplied" the work of the defendants and the district court, and it sanctioned Love's attorney.

**[19]** The evidence supports the district court's conclusion that the Lanham Act claims were "groundless and unreasonable," and we agree that the case is exceptional as a matter of law.[13]

D

In appealing both the copyright claim awards and the Lanham Act claim awards, Love attempts to assert what he calls an advice of counsel defense. He argues that he should not be punished for his lawyers' litigation strategy.

The only case that Love cites in his brief that could support an advice of counsel defense is *Takecare Corp. v. Takecare of Okla., Inc.*, 889 F.2d 955 (10th Cir. 1989). In *Takecare*, however, the exceptionality finding that supported an award of attorney's fees was based on the defendant's wilfully illegal use of a mark after having received notice of infringement. *Id.* at 957. The court held that "a party's reasonable reliance on the advice of counsel may defuse otherwise wilful conduct," but that the defendant failed to prove reasonable reliance. *Id.* at 957-58.

**[20]** Here, the district court's finding of exceptional circumstances was based not on wilful out-of-court conduct by Love, but rather on the unreasonableness of his Trademark claims and his continued pursuit of the claims in bad faith. Similarly, the Copyright attorney's fees were awarded based

---

[13]Because we affirm dismissal of the Lanham Act claims based on Sanctuary's argument that the statute does not apply extraterritorially to the violations alleged in Love's complaint, we focus on the weaknesses of Love's argument on this ground. However, the fact that the district court dismissed two of the claims on other grounds that we do not reach is relevant to our determination that this is an exceptional case. In particular, we note that the district court found that Love "stated absolutely no allegations against [the Sanctuary defendants] by which they (as opposed to ANL) could be held responsible for the creation or distribution of the allegedly infringing material."

on the frivolous and unreasonable nature of those claims. If plaintiffs could evade attorney's fees awards by showing that the litigation was conducted based on the advice of counsel, attorney's fees would never be awarded to defendants under the Lanham or Copyright Acts. *Cf. Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143, 1148 (10th Cir. 2000) ("[W]e disagree that there should be, or even could be, perfect harmony between the standard for awarding attorney fees to a prevailing plaintiff and a prevailing defendant. When attorney fees are awarded against a defendant, the court looks to whether the defendant's *acts of infringement* were pursued in bad faith. When attorney fees are awarded against a plaintiff, the court looks to the plaintiff's conduct *in bringing the lawsuit and the manner in which it is prosecuted*.").

E

**[21]** The district court found that the remaining claims were inexorably intertwined with claims for which attorney's fees awards were warranted. Love does not argue to the contrary. Because the district properly exercised its discretion in awarding attorney's fees for each and every claim against the Sanctuary defendants, it did not err not segregating the award by claim.

VI

Under the circumstances presented by this case, we conclude that neither the Lanham Act nor California's right of publicity apply extraterritorially. The district court did not err in awarding fees.

**AFFIRMED.**